**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION**

| | | |
|---|---|---|
| **GARY R. CHOLLETT,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. V-08-27** |
| | § | |
| **PATTERSON-UTI DRILLING** | § | |
| **SERVICES, LP, LLLP,** | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM OPINION AND ORDER

Gary R. Chollett ("Chollett" or "Plaintiff") brought this lawsuit against Patterson-UTI

Drilling Services, LP, LLLP ("Patterson" or "Defendant") alleging violation of the Family and

Medical Leave Act ("FMLA"), the Americans with Disabilities Act ("ADA"), the Texas

Commission on Human Rights Act ("TCHRA"), and § 451 of the Texas Labor Code.  Pending

before the Court is Patterson's Motion for Summary Judgment (Dkt. No. 19).  Having considered

the motion, response, reply, record, and relevant law, the Court finds that the motion should be

GRANTED in part and DENIED in part.

### Factual & Procedural Background

Chollett—who worked for Patterson on a drilling rig—has spent almost his entire career

working on oil and gas drilling rigs.  (Chollett Decl. at ¶ 2).  While working at Patterson,

Chollett only held the position of floorhand or motorhand, also referred to as a motorman.

(Chollett Dep. at 179:16-18).  All floorhands, including the motorhand, perform very heavy

manual labor and must be able to repeatedly lift and carry 100 pounds.  (Cullifer Decl. at ¶ 6, Ex.

1).

On July 31, 2005, Chollett injured his left shoulder on the job when pipe weighing

several hundred pounds fell on him.  (Chollett Decl. at ¶ 4).  Chollett's doctor gave him a light-duty work restriction, and Patterson made an offer of light-duty employment to Chollett.  (*Id.* at ¶ 5, 7).  According to Chollett, Patterson stated that if Chollett did not agree to and sign Patterson's written offer of light-duty employment, Chollett would be fired.  (*Id.*).  Chollett signed the written offer of light-duty employment, which stated that the light duty would "continue until a full release is issued."  (*Id.*, Ex. 1).  Chollett claims that Patterson required him to work light duty to avoid having the injury and incident classified as a lost time incident because lost time incidents increased Patterson's insurance rates and had to be disclosed in the safety reports that were provided to customers and potential customers of Patterson.  (Lopez Decl. at ¶ 5-7).  Lost time incidents also reduced and/or eliminated certain bonuses of rig managers and other employees of Patterson.  (Clifton Dep. at 150:2-152:7, Ex. 62).  A workers' compensation claim was made and filed for Chollett's July 31, 2005, injury, and that claim was handled in-house by Patterson.

During the next thirteen months, Chollett remained on light duty and had two out-patient surgeries.  (Chollett Dep. at 106:20-23, 117:12-18).  During this time, Patterson hired an extra hand on the rig to do the heavy lifting that Chollett could not perform because of his restrictions.  (*Id.* at 116:3-19).  On August 12, 2006, thirteen months after being put on light duty, Chollett re-injured his left shoulder.  (Chollett Decl. at ¶ 13; Solcher Decl. at Ex. 7).  After meeting with Chollett on August 17, 2006, Dr. Solcher imposed additional light-duty work restrictions on Chollett, and Patterson immediately terminated Chollett's employment on August 17, 2006.  Patterson's stated reason for the termination is that it has a six-month cap on the amount of time an employee is permitted to work light duty for a work-related injury.  (Cullifer Decl. at ¶ 7,  Ex.

2-3).

Patterson circulated a memo between upper management on August 12, 2006.  (Cullifer Dep. at Ex. 73).  This memo states, among other things, that Titus Clifton or Mike Fields, safety supervisors for Patterson, will be at Chollett's next doctor's appointment and after the appointment they will decide what to do with Chollett.  (*Id.*).  This memo goes on to say that Chollett is over 60 years of age, Chollett was 56 on May 4, 2009, (Chollett Decl. at ¶ 2), and that Patterson may be better off terminating Chollett.  (*Id.*).  Chollett's employment was terminated five days later on August 17, 2006.  (Chollett Decl. at ¶ 13).  The decision to terminate Chollett's employment was made by Mark Cullifer, Patterson's Vice President of Operation Services, who manages workers' compensation claims and processes from Snyder, Texas.  Cullifer decided to enforce Patterson's six-month, light-duty policy.  (Cullifer Decl. at ¶ 7, 9).  Chollett was informed that he could contact Patterson about returning to work when he received a full duty release.  (Chollett Dep. at 131:11-16).

After Chollett's termination on August 17, 2006, Patterson reported Chollett's workers' compensation claim for the first time to the State of Texas and to Liberty Mutual, its workers' compensation carrier, and also sent a first report of injury to the State and Liberty Mutual.  (Cullifer Dep. at Ex. 71).  It was at this time that Chollett first began receiving lost income or weekly workers' compensation benefits.  (Chollett Decl. at ¶ 14).  Chollett received workers' compensation benefits until November 2006, when he reached maximum medical improvement with a zero percent impairment rating.  (Chollett Dep. at 133:21-134:4, Ex. 38).  After Chollett's workers' compensation benefits ceased, he received a full duty release, approximately three months after he was fired.  (*Id.* at Ex. 37).

According to Chollett, when he received his full duty release, the oil field was booming and Patterson could not find enough hands to work on its rigs.  (Chollett Decl. at ¶ 15).  Chollett claims to have received numerous calls from rig managers and other Patterson employees requesting that he return to work.  (*Id.*).  Thereafter, Chollett was rehired.  (*Id.*; Cullifer Dep. at 131:3-19).

After being rehired in December 2006, Chollett worked several months without any restrictions.  (Chollett Decl. at ¶ 15).  Chollett was even promoted and given a raise a few weeks after he was rehired.  (Chollett Dep. at 147:5-12, 148:5-7, Ex. 41).  After Chollett was reinstated, he informed Patterson that he wanted off the rig generally, and out of the motorman position specifically, so that he could be transferred to the office in Victoria.  (*Id.* at 152: 9-17, Ex. 52).  Chollett stated that he wanted an "easier job." (Chollett Dep. at 196:22-197:5).  However, according to Patterson, there were no vacant positions. (Cullifer Decl. at ¶10).

Chollet started having problems with his shoulder while working in April of 2007, (Chollett Dep. at 148:10-12 & Ex. 43), and Chollett re-injured his left shoulder on June 28, 2007,[1] (Chollett Decl. at ¶ 16).  As a result, Dr. Solcher imposed light-duty restrictions on July 6, 2007, which included a lifting restriction of fifty pounds.  (Chollett Decl. at ¶ 19, Ex. 5).  Dr. Solcher restricted Chollett from lifting more than fifty pounds at least through August 1, 2007.  (*Id.*).

After receiving the July 6, 2007, light-duty restrictions, Walter Koricanek, the drilling

---

[1]Patterson goes to great lengths to make clear that Chollett did not have a new injury; "rather, the original injury from July 2005 was just getting sore while he worked."  (Dkt. No. 19 at 11).  To the extent the characterization of Chollett's subsequent "problems" is determinative to the issues presented on summary judgment, the Court finds that Chollett has presented evidence to create a fact issue as to whether he had subsequent injuries, or re-injuries, even though the shoulder problems started on with the "original" injury on July 31, 2005.

superintendent for the Victoria region where Chollett worked, directed Chollett to go to Rig 528, which was idle or stacked at the time, and relieve another worker watching the rig.  (*Id.* at ¶19). When Chollett arrived at the rig, the employee Chollett was relieving told Chollett to call Titus Clifton, the safety supervisor.  (*Id.*).  Chollett called Clifton and was told that he could not watch an idle or stacked rig unless he had a full duty release.  (*Id.*).  Chollett claims that after making this phone call to Clifton he observed, in plain view, the "hand over notes" for the rig, which stated that "Pa-Pa needs full release to return—find excuse for him not to be rehired (office)." (*Id.* at ¶ 19, Ex. 6).  Chollett's nickname is Pa-Pa.  (*Id.* at ¶ 19).  Chollett claims that the note was written by T.J. Styra, a rig manager for Rig 528, as Chollett is familiar with and recognizes Styra's handwriting.  (*Id.*).

Chollett obtained a full duty release from Dr. Solcher, his primary treating doctor, on July 19, 2007.  (*Id.* at Ex. 7).  Dr. Solcher's office sent a copy of this full duty release to Liberty Mutual.  (Solcher Decl. at ¶ 10).  Chollett faxed a copy of the full duty release to Titus Clifton at Patterson's office in Victoria.  (Chollett Decl. at ¶ 20, Ex. 7).  Chollett also claims to have taken a copy of the full duty release and hand delivered it to Patterson at its Victoria office.  (*Id.* at ¶ 20).  Chollett claims that, notwithstanding this full duty release, Patterson would not allow Chollett to return to work.  (*Id.*).  Patterson, on the other hand, claims that it never received a copy of the full duty release.  (Culifer Decl. at ¶ 12).  After Chollett obtained his last full duty release, Ray Borden, Chollett's rig manager in June and July 2007, wanted to call Chollett and ask Chollett to be part of his crew on Rig 528 when it started drilling again.  (Borden Dep. at 32:20-36:2).  However, the upper management at Patterson would not allow Borden to do so. (Borden Dep. at 33:10-34:3).  Instead, Borden was directed to complete a separation notice for

Chollett.  (Borden Dep. at 35:18-36:2; Chollett Dep. at Ex. 46).  The Separation Notice was completed and prepared on September 8, 2007, and made retroactive to June 30, 2007.  (Chollett Dep. at Ex. 46).  Chollett was never rehired by Patterson.

The month after Chollett's last day of work, Chollett filed a Charge of Discrimination with the EEOC, and the EEOC conducted an investigation of Chollett's discrimination claims.  (Chollett Dep. at Ex. 51; Tipton Decl. at Ex. 8).  The EEOC found that Chollett "did not provide information that would substantiate his allegations."  (Chollett Dep. at 210:23-211:8, Ex. 56; Tipton Decl. at Ex. 8).  The EEOC determined that Chollett failed to establish a prima facie case of disability discrimination because he did not have a disability under the ADA, was not otherwise qualified because he could not perform the duties of his motorman job, and failed to establish the requisite causal standard.  (Chollett Dep. at Ex. 57-58; Tipton Decl. at Ex. 8).  Additional facts relevant to the adjudication of this matter are developed below as necessary.

## Standard of Review

A motion for summary judgment shall be granted if the pleadings and evidence "show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *Hall v. Thomas*, 190 F.3d 693, 695 (5th Cir. 1999).  In considering a motion for summary judgment, the Court construes factual controversies in the light most favorable to the nonmovant, but only if both parties have introduced evidence showing that an actual controversy exists.  *Lynch Props., Inc. v. Potomac Ins. Co. of Ill.*, 140 F.3d 622, 625 (5th Cir. 1998).  If the burden of proof at trial lies with the nonmovant, the movant may satisfy its initial burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."  *See Celotex Corp. v. Catrett*,

477 U.S. 317, 323 (1986).  The burden is on the movant to convince the court that no genuine

issue of material fact exists as to the claims asserted by the nonmovant, but the movant is not

required to negate elements of the nonmovant's case.  *Id.* at 323.

      The nonmoving party may not rest solely on its pleadings.  *King v. Chide*, 974 F.2d 653,

656 (5th Cir. 1992).  For issues on which the nonmovant will bear the burden of proof at trial,

that party must produce summary judgment evidence and designate specific facts which indicate

that there is a genuine issue for trial.  *Celotex*, 477 U.S. at 324; *Wallace v. Tex. Tech. Univ.*, 80

F.3d 1042, 1047 (5th Cir. 1996).  Needless to say, unsubstantiated assertions are not competent

summary judgment evidence.  *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994); *Douglass v.

United Servs. Auto. Assoc.*, 79 F.3d 1415, 1429 (5th Cir. 1996) ("[C]onclusory allegations,

speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden.").

The nonmovant "must do more than simply show that there is some metaphysical doubt as to the

material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

To meet its burden, the nonmoving party must present "significant probative" evidence

indicating that there is a triable issue of fact.  *Conkling v. Turner*, 18 F.3d 1285, 1295 (5th Cir.

1994).  If the evidence rebutting the summary judgment motion is only colorable or not

significantly probative, summary judgment should be granted.  *Anderson v. Liberty Lobby, Inc*.,

477 U.S. 242, 249-50 (1986).

### Objections to Summary Judgment Evidence

      Patterson filed numerous objections to portions of Chollett's summary judgment

evidence (Dkt. No. 23). The Court has considered the evidence proffered, the objections thereto,

and Chollett's response. While some objections have merit, to the extent the Court has regarded

portions of the evidence as admissible and necessary to the resolution of particular summary judgment issues, it hereby OVERRULES Patterson's objections. To the extent such evidence has not been relied on by the Court, the remaining objections are DENIED as moot.

### Family and Medical Leave Act

The FMLA entitles an eligible employee to a total of twelve weeks of leave during any twelve-month period "[b]ecause of a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D); *Haley v. Alliance Compressor LLC*, 391 F.3d 644, 649 (5th Cir. 2004). After a qualifying absence, the employer must restore the employee to the same position or a position comparable to that held by the employee before the leave. 29 U.S.C. § 2614(a)(1). These prescriptive or substantive FMLA rights—invoking entitlement or interference theories of recovery—are brought under § 2615(a)(1). *Haley*, 391 F.3d at 649. The FMLA's proscriptive rights "include an employee's right not to be discriminated or retaliated against for having exercised the right to take FMLA leave." *See id.* Plaintiffs may bring claims for violations of proscriptive rights under 29 U.S.C. § 2615(a)(2). Chollett asserts claims for both prescriptive and proscriptive FMLA violations, and the Court divides its analysis into two parts corresponding to the two theories of recovery.

### I.      Prescriptive Claim

Chollett claims that his rights under the FMLA were violated in August 2006 and July 2007 when Patterson terminated his employment instead of putting him on FMLA leave. (Dkt. No. 17). To prevail on a claim for prescriptive relief, a plaintiff must show "that (1) she is an eligible employee under the FMLA, (2) the defendant is an employer subject to the requirements of the FMLA, (3) she was entitled to FMLA leave, (4) she gave notice to the defendant of her

intention to take FMLA leave, and (5) the defendant denied her the benefits to which, under the FMLA, she was entitled." *Ford-Evans v. Smith*, No. H-04-3344, 2007 WL 1795717, at *4 (S.D. Tex. June 19, 2007); *De La Rama v. Ill. Dep't of Human Servs.*, 541 F.3d 681, 687 (7th Cir. 2008). Patterson claims that Chollett cannot establish elements three, four, or five, because Chollett cannot show that he is entitled to FMLA leave—because he did not have a "serious health condition"—or that he provided Patterson with notice of his intent to take FMLA leave. Because the Court finds that Chollett cannot satisfy the "notice" element of his FMLA claim, the Court need not consider whether Chollett had a "serious medical condition."

An employer's duties are triggered under the FMLA when the employee provides enough information to alert the employer that the employee may be in need of FMLA leave. *Willis v. Coca Cola Enters.*, 445 F.3d 413, 417 (5th Cir. 2006); *Browning v. Liberty Mut. Ins. Co.*, 178 F.3d 1043, 1049 (8th Cir. 1999). An employee does not need to specifically mention FMLA leave, "*but must state that leave is needed.*" *Browning*, 178 F.3d at 1049 (emphasis added). "The critical question is whether the information imparted to the employer is sufficient to reasonably apprise it of the employee's *request to take time off* for a serious health condition." *Satterfield v. Wal-Mart Stores, Inc.,* 135 F.3d 973, 977 (5th Cir. 1998) (emphasis altered).

Chollett claims that the FMLA does not require him to notify Patterson of his desire to take time off because "Defendant knew about Plaintiff's physical problem with his shoulder." (Dkt. No. 21 at 31). Chollett claims that Patterson's action in refusing to allow Chollett to continue as a light-duty employee was an "involuntary leave." (*Id.*). In making this argument, Chollett acknowledges that he never actually asked for leave of any kind. Rather, he claims, when his employment with Patterson was terminated, he should have been put on involuntary

9

FMLA leave and had the opportunity to avail himself of his FMLA rights within the first twelve weeks of that leave.  "Involuntary FMLA leave" is recognized by the Fifth Circuit.  *Willis*, 445 F.3d at 417.  However, in the case of involuntary leave, the employee must "provide sufficient notice to an employer of the need to take FMLA *leave*."  *Id.* at 418-19 (emphasis added).  An important distinction between *Willis* and this case is that in *Willis*, the employee requested time off.  *Id.* at 415.  While the employee in *Willis* wanted to return to work after requesting—and taking—time off, she still made a *request*.  *Id.* at 416 (the employer "was aware that she *had requested time off*") (emphasis added).  Chollett, on the other hand, never requested *any* leave. The record shows that Chollett never wanted any time off from work; he wanted to continue working.  (Chollett Dep. at 217:18-20, 205:17-20, 159:4-9, 112:9-19, 208:13-16).

Chollett also points to the Tenth Circuit case of *Tate v. Farmland Indus., Inc.*, 268 F.3d 989 (10th Cir. 2001) for support.  In *Tate*, the employee—a commercial motor vehicle (CMV) driver—disclosed during a physical for recertification of his CMV license that he had a history of "seizures, fits, convulsions or fainting."  *Id.* at 991.  Shortly after learning this, the employer placed the employee on sick leave "while determining whether his history of seizures and use of antiseizure medication would permit him to continue working as a CMV operator."  *Id.*  While the employee was on sick leave, the employer officially terminated his employment.  *Id.*  The employer viewed the employee as unqualified to work as a CMV operator, as the Department of Transportation's "interpretation of its own regulations strongly suggest[ed] that a driver . . . taking antiseizure medication for any reason [wa]s not qualified to drive a CMV."  *Id.* at 992.  In ruling that the district court erred in dismissing the FMLA claim on Fed. R. Civ. P. 12(b)(6) grounds, the Tenth Circuit held that the employee did not need to allege that he requested FMLA

benefits when the employer placed the employee on sick leave, as the "Defendant was clearly on notice that Plaintiff might qualify for FMLA benefits since Defendant triggered Plaintiff's leave." *Id.* at 997.  At first, *Tate* seems to suggest that an employer only needs to be on notice of a FMLA-qualifying reason for taking leave, not notice that the employee wants to actually *take leave*.  However, the Tenth Circuit expanded on *Tate* in a 2005 unpublished opinion.  *Howard v. Garage Door Group, Inc.*, 136 F. App'x 108 (10th Cir. 2005).  In *Howard*, the Tenth Circuit cited *Tate* for the notion that "[a]n employer . . . is obligated under §2615(a) to specifically inform an employee of his or her right to FMLA leave only when the 'employer is *on notice* that the employee might qualify for FMLA benefits.'"  *Howard*, 136 F. App'x at 114 (emphasis in original).  The *Howard* court went on to state that "[a]t a minimum, this requires that the employer be on notice that the employee <u>wants leave</u>."  *Id.*  The court said this notice can arise from verbal notification from the employee or be "inferred from an employer's own act of placing the employee on sick leave."  *Id.*  Because the employee in *Howard* "was not on leave, nor had she asked for leave," the employer was "under no obligation to specifically inform [her] of her right to FMLA leave and did not interfere with [her] rights when it failed to do so."  *Id.* at 115.  In this case, Chollett does not show that he was on leave or that he asked for leave, (Chollett Dep. at 217:18-20, 205:17-20, 159:4-9; 112:9-19, 208:13-16), and in light of Chollett's testimony that he never wanted leave, (Chollett Dep. at 217:18-20, 205:17-20, 159:4-9, 112:9-19, 208:13-16), no inference of "notice" can arise.  Therefore, Chollett cannot satisfy the notice element of his prescriptive FMLA claim.  A district court in this circuit reached a similar result when an employee who was diagnosed with cancer—her employer knew about the cancer diagnosis—had her position eliminated.  *Strauss v. Keith Zars Pools, Inc.*, No. SA-07-CA-601-

OG, 2008 WL 4871493, at *1 (W.D. Tex. Aug. 29, 2008).  This employee never requested any time off and "chose to continue working with full pay instead of taking FMLA leave without pay."  *Id.* at *2.  That court held that "[t]he FMLA clearly provides that an employee must give the employer notice that she intends to take leave time under the Act," and since the employee "failed to even request leave under the Act," she "never invoked the protections afforded under the FMLA."  *Id.* at *2-3.

While Chollett claims that "Defendant *should have* known that the FMLA *could have been* implicated and that Plaintiff *might be entitled* to FMLA leave rather than being terminated,"  (Dkt. No. 21 at 33-34) (emphasis added), the Fifth Circuit has stated, "the employer is not required to be clairvoyant," *Satterfield*, 135 F.3d at 980 (citation omitted).  Because Chollett never requested to take time off from work and cannot satisfy the notice element of his prescriptive FMLA claim, summary judgment is appropriate on Chollett's prescriptive FMLA claim.

## II.     Proscriptive Claim

A proscriptive claim under the FMLA protects employees from retaliation or discrimination for exercising their rights under the FMLA.  *Mauder v. Metro Transit Auth. of Harris County*, 446 F.3d 574, 580 (5th Cir. 2006).  To prevail on a proscriptive claim, a plaintiff must prove: 1) she is protected under the FMLA; 2) she suffered an adverse employment action; and 3) she was treated less favorable than an employee who had not requested leave under the FMLA or the adverse decision was made because she sought protection under the FMLA.  *Id.* at 583; *Hunt v. Rapides Healthcare Sys.*, 277 F.3d 757, 768 (5th Cir. 2001).  "Once the complaining party establishes a prima facie case of deprivation of a substantive right to

reinstatement under the FMLA, the burden shifts to the defendant to prove that the plaintiff would have been terminated during the FMLA leave period and is therefore not entitled to restoration of his position.  Thereafter, the burden shifts back to the plaintiff to show by a preponderance of the evidence that the reasoning presented by the defendant is a pretext for retaliation."  *Mauder*, 446 F.3d at 583 (citations omitted).

While Patterson claims that Chollett cannot establish any of the elements of a proscriptive claim, the Court need not consider whether this is true because, as discussed above, Chollett cannot show that he is protected under the FMLA, as he did not request FMLA leave. *See supra*.  Accordingly, summary judgment is appropriate on Chollett's prospective FMLA claim.

## Disability Claims

Chollett alleges that he was discharged because of his disability in violation of both the ADA[2] and the TCHRA.[3]  Under the ADA, it is unlawful for an employer to discriminate against "a qualified individual on the basis of disability in regard to job application procedures[;] the hiring, advancement, or discharge of employees[;] employee compensation[;] job training[;] and other terms, conditions, and privileges of employment." 42 U.S.C.A. § 12112(a).

Chollett filed his Charge of Discrimination on August 30, 2007, and, under the ADA,

---

[2]Congress recently enacted the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008).  However, the effective date of that Act is January 1, 2009, and the Fifth Circuit has held that the changes do not apply retroactively.  *E.E.O.C. v. Argo Distribution, LLC*, 555 F.3d 462, 469 n.8 (5th Cir. 2009).  Accordingly, this case, which was filed on April 3, 2008, is analyzed under the preexisting case law interpreting the definition of disability.

[3]Because the TCHRA and the ADA are so similar, Texas courts rely on analogous federal precedent when interpreting the TCHRA.  *See Rodriguez v. Conagra Grocery Prods. Co.*, 436 F.3d 468, 473-74 (5th Cir. 2006); *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 285-86 (5th Cir. 2004).  Therefore, Chollett's TCHRA and ADA claims will be treated as coextensive and the Court will focus on federal precedents in evaluating both.

only acts that occurred within 300 days of that date are actionable.  *Henson v. Bell Helicopter Textron, Inc.*, 128 Fed. App'x 387, 390 (5th Cir. 2005) (citing 42 U.S.C. § 12117).  Accordingly, Patterson's decision to terminate Chollett's employment in August 2006 is time-barred, leaving only the July 2007 decision.

Under the familiar *McDonnell Douglas* framework, Chollett must first establish a prima facie case of discrimination by showing: (1) he suffers from a disability as defined by statute; (2) he was qualified for his job; (3) he experienced an adverse employment action on account of his disability; and (4) Patterson replaced him with or treated him less favorably than a nondisabled employee.  *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 511 (5th Cir. 2003); *Allen v. Rapides Parish School Bd.*, 204 F.3d 619, 623 n.3 (5th Cir. 2000); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  Once Chollett establishes his prima facie case, the burden shifts to Patterson to articulate a legitimate, nondiscriminatory reason for the adverse employment action.  *Gowesky*, 321 F.3d at 511.  Once Patterson articulates such a reason, the burden shifts back to Chollett to show by a preponderance of the evidence that the reason was (1) merely a pretext for unlawful discrimination or (2) only one of the reasons for its actions and that another motivating factor was Chollett's protected characteristic.  *Id.*; *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004).

Patterson claims that Chollett cannot prove that he had a disability or that he was a qualified individual.

## I.      Disability

A plaintiff is "disabled" under the ADA if he: (1) has a physical or mental impairment that substantially limits one or more of his major life activities; (2) has a record of such an

impairment; or (3) is regarded by his employer as having such an impairment. 42 U.S.C. §

12102(2).  Patterson claims that Chollett cannot prove that he is disabled under any of these

theories.  However, the Court finds that Chollett has presented enough evidence to show that he

had an impairment that substantially limited the major life activity of working.

    An individual is "substantially limited" if he or she is:

    (i) Unable to perform a major life activity that the average person in the general

    population can perform; or (ii) Significantly restricted as to the condition, manner

    or duration under which an individual can perform a particular major life activity

    as compared to the condition, manner, or duration under which the average person

    in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j).

    "Major life activities" includes functions such as "caring for oneself, performing manual

tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. §

1630.2(i).  Whether an impairment substantially limits a major life activity depends on the

following factors: "(i) The nature and severity of the impairment; (ii) The duration or expected

duration of the impairment; and (iii) The permanent or long term impact, or the expected

permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2).

In addition to the factors listed in § 1630.2(j)(2), a court may also look at the following factors

when determining whether an individual is substantially limited in the major life activity of

working:

    (A) The geographical area to which the individual has reasonable access;

    (B) The job from which the individual has been disqualified because of an

impairment, and the number and types of jobs utilizing similar training,

knowledge, skills, or abilities, within that geographical area, from which the

individual is also disqualified because of the impairment (class of jobs); and/or

(C) The job from which the individual has been disqualified because of an

impairment, and the number and types of other jobs not utilizing similar training,

knowledge, skills, or abilities, within that geographical area, from which the

individual is also disqualified because of the impairment (broad range of jobs in

various classes).

29 C.F.R. § 1630.2(j)(3)(ii).

With regard to the activity of working:

[S]ubstantially limits means significantly restricted in the ability to

perform either a class of jobs or a broad range of jobs in various classes as

compared to the average person having comparable training, skills and abilities.

The inability to perform a single, particular job does not constitute a substantial

limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(i).

Patterson cites *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1120 (5th Cir. 1998) to show

that the "lifting restrictions were simply not a substantial impairment on Plaintiff's ability to

work." (Dkt. No. 22 at 18-19).   However, the *Sherrod* court held that the plaintiff "*fail[ed to]* . .

. *present[] evidence* of the number and types of jobs from which she is disqualified, or evidence

that her training and skills limit her to jobs requiring heavy lifting."  *Id.* (emphasis added).

Chollett, on the other hand, has produced evidence to show that he was significantly

restricted, because of his lifting impairment, in the ability to perform a class of jobs and a broad range of jobs in various classes, specifically working as a roughneck and other jobs involving manual labor.  Chollett has shown that he is at least fifty-six years old, did not graduate from high school, did not go to college or any other professional school, and began working in the oilfield when he was about eighteen years old.  (Chollett Decl. at ¶ 2).  Other than a short time as a lineman for an electrical company, Chollett has spent his "entire work career . . . in the oilfield, mainly working on drilling rigs as a 'roughneck.'" (*Id.*).   Chollett also produced evidence showing that because of his lack of income and family ties, he is unable to move to another state or area of Texas to find work.  (*Id.* at ¶ 23).  Chollett has also presented evidence that heavy lifting of more than fifty pounds is a necessary part of working as a roughneck and that if a person is limited in his ability to lift more than fifty pounds, it is almost impossible to get a job as a roughneck.  (*Id.*).  Chollett also showed that despite his diligent search for work with several drilling companies in the geographical area, the fifty-pound weight restriction placed on Chollett by Dr. Solcher on July 2, 2007, prevented other drilling companies from hiring him.  (*Id.*).  The Court finds that Chollett has, therefore, presented enough evidence to show that he had an impairment that substantially limited his ability to perform a class of jobs and/or a broad range of jobs in various classes.  The Court need not consider whether Chollett had a record of disability or whether he was regarded by Patterson as having a disability.

**II.**    **"Otherwise Qualified"**

Patterson next argues that even if Chollett does have a disability, he is not qualified for the job.

Determining whether Chollett is qualified for the job involves a two-prong test.  First, the

Court must determine whether Chollett could perform the essential functions of the job; second, if he is not able to perform the essential functions, the Court must determine whether any reasonable accommodation by Patterson would enable him to perform those functions. *Chandler v. City of Dallas*, 2 F.3d 1385, 1393-94 (5th Cir.1993). Chollett has the burden to show that he is "otherwise qualified" for the job. *Id.*

The ADA defines reasonable accommodation as:

(A)     making existing facilities used by employees readily accessible to and useable by individuals with disabilities; and

(B)     job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training material or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9).

Chollett does not argue that he could perform the essential functions of his job; rather, he argues that a reasonable accommodation would have enabled him to perform the essential functions of his job. Chollett must demonstrate that an accommodation exists and that such accommodation is reasonable. *Riel v. Elec. Dada Sys. Corp.*, 99 F.3d 678, 681-82 (5th Cir. 1996). An "employer may defend by showing business necessity or undue burden." *Id.*[4]

Chollett has presented evidence showing that Patterson could have allowed Chollett the

---

[4]Patterson does not argue that the accommodations proposed by Chollett would create an undue burden on it or were foreclosed by a business necessity.

reasonable accommodation of watching Rig 528 in early July 2007 after Chollett received the

fifty-pound lifting restriction.  Chollett has also presented evidence showing that the position

was available, as Walter Koricanek, the area superintendent for Patterson, told Chollett to do "rig

watch" on Rig 528 after Chollett's July 2007 restrictions, although that instruction was later

revoked by Titus Clifton.  (Chollett Decl. at ¶ 19).  Chollett has shown that he could have

performed the duties of rig watch without any problems and without violating his work

restrictions.  (*Id.*; Styra Dep. at 43:5-23).  Chollett does not suggest that this should have been a

permanent accommodation.  Rather, he suggests that Patterson should have allowed him to

perform rig watch until his light-duty restriction was expected to expire on August 1, 2007.

(Chollett Decl., Ex. 5).

Chollett suggests yet another reasonable accommodation.  He asserts that Patterson could

have granted him unpaid leave for the thirty days the light-duty restriction imposed by Dr.

Solcher was expected to be in place.  (*Id.*).

The Court finds that both of these accommodations are reasonable and available.

Accordingly, summary judgment is denied on Chollett's ADA and TCHRA claims.

### Workers' Compensation Retaliation

Section 451.001 of the Texas Labor Code prohibits an employer from discharging or

discriminating against an employee because that employee has filed a workers' compensation

claim in good faith.  Tex. Lab. Code § 451.001.  The elements of a prima facie case of retaliation

under the workers' compensation act are that: (1) the employee filed a claim for workers'

compensation benefits in good faith; (2) he suffered an adverse employment action; and (3) there

is a causal link between the adverse employment action and the filing of the workers'

19

compensation claim. *Benners v. Blanks Color Imaging, Inc.*, 133 S.W.3d 364, 369 (Tex. App.—Dallas 2004, no pet.). Once an employee makes out a prima facie case of retaliation, the employer may then rebut the claim of retaliation by showing that there was a legitimate, nonretaliatory reason for its action. *Swearingen v. Owens-Corning Fiberglas Corp.*, 968 F.2d 559, 562 (5th Cir.1992). If the defendant makes this showing, the burden shifts back to the plaintiff to raise a fact issue as to the employer's retaliatory motive, by either direct or circumstantial evidence. *Garcia v. Allen*, 28 S.W.3d 587, 600 (Tex. App.—Corpus Christi 2000, pet. denied); *Texas Division-Tranter, Inc. v. Carrozza*, 876 S.W.2d 312, 314 (Tex. 1994). Patterson argues that Chollett cannot establish a prima facie case because he cannot show a causal connection between his workers' compensation claim and his termination in August 2006 and July 2007.

"A causal connection is established between a plaintiff's protected action and a defendant's retaliation if, but for the employee's action, the adverse employment action would not have occurred when it did." *Id.* (citing *Cont'l Coffee Prods. Co. v. Cazarez*, 937 S.W.2d 444, 450-51 (Tex. 1996)). The causal link may be shown by direct or circumstantial evidence. *Garcia v. Allen*, 28 S.W.3d 587, 600 (Tex.App.—Corpus Christi 2000, pet. denied). Examples of circumstantial evidence that may support the causal link include: (1) knowledge of the claim by those making the decision to terminate; (2) expression of a negative attitude toward the employee's injured condition; (3) failure to adhere to established company policies; (4) discriminatory treatment in comparison to similarly situated employees; and (5) evidence that the stated reason for the discharge was false. *Ferguson v. Extraco Mortgage Co*, 264 F. App'x 351, 353 (5th Cir. 2007).

In this case, it is undisputed that Mark Cullifer, the Patterson employee who made the decision regarding Chollett's employment, knew about Chollett's workers' compensation claim. However, knowledge of the workers' compensation claim standing alone is not sufficient. *Urquidi v. Phelps Dodge Refining Corp.*, 973 S.W.2d 400, 403 (Tex. App.—El Paso 1998, no pet.). Consequently, this factor, standing alone, aids Chollett no more than a scintilla.

Both Chollett and Patterson claim that the second element weighs in their favor. Chollett testified that he was happy with the way he was treated by Patterson after his injury and was treated well. (Chollett Dep. at 98:22-99:21, 100:4-101:10). Chollett also testified that no one ever gave him a hard time about receiving workers' compensation benefits, and he never saw any other instances of workers' compensation retaliation or discrimination at Patterson. (*Id.* 98:22-99:21; *Id.* at 221:15-17). Indeed, Chollett testified that Patterson was always supportive and even rehired him in November 2006 after his injury and workers' compensation claim. (*Id.* at 88:23-89:5, 114:1-11, 101:17-102:13, 146:16-21, 147:17-22, 150:25-151:10).

On the other hand, Chollett has presented evidence that Peter Lopez, one of Chollett's supervisors, heard Titus Clifton, a safety supervisor for Patterson, make negative comments about Chollett's injury and condition. For example, Lopez states that he heard Clifton tell Chollett that Chollett would be fired if he did not come back to work right away, even after his surgery. (Lopez Decl. at ¶ 5). Lopez also states that he heard Clifton tell him this same thing—if Chollett did not return to work right away, he would be fired. (*Id.*). Chollett claims that he heard comments from Clifton and other Patterson employees, following his injury, that implied that Chollett was "no young man," and that the "injury slowed [him] down." (Chollett Dep. at 217:5-8). Chollett claims that he did not stay at home and recuperate after his second

surgery because Patterson told him that it did not want a lost time incident on his second surgery and that Chollett had to be at the rig or he would be fired and that he would not receive workers' compensation.  (*Id.* at 100:23-101:5).  Last, Chollett claims that Clifton's actions expressed a negative attitude toward Chollett's injury.  Clifton did not arrange physical therapy for Chollett near the job site like he told Chollett and Lopez he would do, which resulted in Chollett not receiving the physical therapy and rehabilitation prescribed by his doctor.  (*Id.* at 126:14-127:6; Lopez Decl. at ¶ 8).

With respect to the third element, the parties, again, both produce evidence showing that this factor weighs in their favor.[5]

Light-Duty Policy in 2006

Chollett shows that, after he was injured in July 2005, Patterson presented him with a Bonafide Offer of Light Duty Employment (BOLDE) and told Chollett that if he did not sign the BOLDE, his employment would be terminated.  (Chollett Decl. at ¶ 5).  The BOLDE stated that the light duty will "begin on 8-8-05 and continue until a full release is issued."  (Chollett Decl., Ex. 2).  On or about June 28, 2006, Patterson revised its BOLDE to state that light duty "begin[s] on _____ and continue[s] until a full release is issued or a maximum time period of six (6) months from date of injury has elapsed."  (Scanes Decl., Ex. 8).  After this policy change, and on the same day Chollett re-injured his left shoulder on the job by slipping and falling on a slick area—August 12, 2006—Terry Allen, Patterson's Regional Safety Coordinator, sent an e-mail to members of Patterson's management staff asserting that Chollett had been on light duty since

---

[5]The fact issue presented by Chollett with respect to Patterson's light-duty policy is not whether the policy is appropriate, as Patterson characterizes Chollett's assertions in its Reply; rather, the issue is what the policy is, who it applies to, and when it applies.

July 31, 2005, and stating that "being over 60 [sic] years old, we may be better in the long run discontinuing light duty."  (Cullifer Dep., Ex. 73).

Chollett claims that Patterson violated the BOLDE accepted and signed by Chollett after his initial injury on July 31, 2005, since no six-month limitation existed at that time.  Chollett asserts that nothing in Patterson's policy or guidelines manual suggests that the six-month limitation would or could apply retroactively to employees who previously agreed to work light-duty employment until receiving a full release.

Patterson, on the other hand, argues that its six-month, light-duty policy only applies to an original injury, and while it did not strictly follow its six-month, light-duty policy with respect to Chollett, this was not to Chollett's detriment, as Patterson allowed Chollett to work light duty more than twice as long as its policy would allow, or thirteen months.  Patterson does not address Chollett's argument regarding Patterson's light-duty policy change.

<u>Light-Duty Policy in 2007</u>

After Chollett received a full duty release, he was rehired by Patterson and started back on Rig 528 in January 2007.  (Chollett Decl. at ¶ 15).  On June 28, 2007, Chollett lifted many heavy sacks of drilling mud that weighed about 100 pounds each and his left shoulder gave out. (*Id.* at ¶ 16).  Chollett reported this injury to Patterson and went to see Dr. Solcher on July 6, 2007.  (*Id.*).  Dr. Solcher restricted Chollett from lifting or carrying objects weighing over fifty pounds for more than eight hours a day.  (*Id.*, Ex. 5).  Chollett claims that Patterson failed to follow its light-duty policy and procedure in July 2007 when it terminated his employment instead of offering him light-duty employment, as Patterson's policy in 2007 was to offer a BOLDE to employees injured on the job. While Patterson claims that it would be a violation of

its policy to offer Chollett a six-month, light-duty position—as the six-month limit is tied to the original injury, not each of Chollett's employment periods—Chollett claims that the six-month, light-duty period applied to each of Chollett's employment periods, especially since there was no mention of the six-month, light-duty period in Chollett's first BOLDE.  Moreover, Chollett states that Patterson's policy does not require a "new injury," as alleged by Patterson, in order to be eligible for light-duty work.  Patterson's policy simply reads that a light-duty program is offered for Patterson "employees who are injured on the job."[6]  (Cullifer Dep., Ex. 68).

With respect to the fourth factor, Chollett does not offer evidence that he suffered discriminatory treatment in comparison to similarly situated employees.  Chollett cannot point to any other injured Patterson employee who was treated more favorably than him.  (Chollett Dep. at 188:2-9).  However, Chollett is not required to offer evidence with respect to every element. *City of Univ. Park v. Van Doren*, 65 S.W.3d 240, 250 (Tex. App.—Dallas 2001, pet. denied).

Chollett also offers evidence related to the final factor, whether the stated reason for Chollett's discharge was false.  While Chollett's second termination was effective June 30, 2007, the separation notice—the official record of Chollett's termination—was not prepared until September 8, 2007.  This separation notice states that Chollett was terminated for not reporting to work.  (Chollett Dep., Ex. 46).  However, there is evidence that the true reason for Chollett's discharge was that he did not have a full duty release.  While Patterson convincingly reconciles the two seemingly inconsistent explanations for Chollett's termination, (Dkt. No. 22 at 9-10), Chollett has still put forward competent evidence of a false reason for his discharge.

Additional factors courts look at to determine causation are 1) the temporal proximity of

---

[6]Essentially, Chollett offers evidence of a fact issue as to whether this policy includes all injuries, e.g., re-injuries and injuries stemming from the original injury, or only an "original" injury.

the workers' compensation injury and the adverse employment action and 2) encouragement or incentives by the employer for employees to refrain from reporting on-the-job injuries. *Ribera v. Pro Commc'ns, Inc.*, No. EP-99-CA-172-DB, 2000 WL 33348724, at *6 (W.D. Tex. Nov. 28, 2000).

In this case, Chollett was injured on July 31, 2005, and his light-duty position was discontinued on August 17, 2006, or thirteen months later. Chollett was again rehired in November 2006, and his employment terminated in July 2007—two years after the injury that is the subject of the workers' compensation claim. Accordingly, Patterson argues that this time period is too long to establish evidence of a causal connection. *See Moody v. M.W. Kellogg Co.*, No. 98-20757, 1999 WL 153032, at *7 (5th Cir. 1999) (six-month period between injury and termination of employment too long to create a fact issue regarding the causal nexus between workers' compensation claim and termination); *Burch v. City of Nacogdoches*, 174 F.3d 615, 623 (5th Cir. 1999) (twenty months between filing clam and discharge too long); *Burfield v. Brown, Moore & Flint, Co.*, 51 F.3d 583, 590 (5th Cir. 1995) (fifteen to sixteen months between filing claim and termination too long). Chollett, on the other hand, calculates the relevant dates in a very different manner. Chollett claims that he reported an injury on August 12, 2006, and was terminated just five days later, on August 17, 2006. After he was rehired, Chollett claims he reported an injury on June 28, 2007, and was discharged just two days later.

"[C]ases finding the timing of the adverse employment decision to be circumstantial evidence of causation have looked to the temporal proximity of the *injury* or *workers' compensation filing* to the date of the adverse employment action." *Moody*, 1999 WL 153032, at *7 (emphasis added). Because the Court has found Chollett has presented enough evidence to

25

create a fact issue as to whether he experienced subsequent injuries, the timing of the adverse employment action against Chollett is circumstantial evidence of a causal connection.

Chollett has also presented evidence that Patterson encouraged employees to refrain from reporting on-the-job injuries and missing work because of an injury.  Chollett has showed that Patterson had an economic incentive to refrain from reporting lost time incidents.  (Lopez Decl. at ¶ 6).  Chollett has also presented evidence that Patterson told Chollett he would lose his job if he did not come back to work right away.  (*Id.*).  In *Haggar Clothing Co. v. Hernandez*, 164 S.W.3d 386, 388 (Tex. 2005), the Texas Supreme Court stated that evidence of an employer's safety-incentive policy, "which included bonus opportunities for units that had accumulated a certain number of hours without a 'lost-time accident' that required an employee to miss work, . . . . may constitute circumstantial evidence supporting a causal link between [employee's] termination and her filing a workers' compensation claim."  *Id.*  Other evidence the *Haggar* court suggested could serve as circumstantial evidence of a causal link included evidence that plant managers "were under economic pressure to minimize workers' compensation claims," placed pressure on employees to remain at work on the day of the injury, and "pressured employees not to report workplace injuries for fear of upsetting co-workers."  *Id.* The evidence considered in *Haggar* is very similar to the type Chollett has presented, and the Court finds that the evidence presented by Chollett relating to this factor also serves as evidence of a causal connection.        Chollett has presented enough competent evidence to establish a prima facie case of retaliation under the workers' compensation act.  While Patterson offers legitimate, nonretaliatory explanations for its actions, the Court finds that Chollett has raised a fact issue as to Patterson's retaliatory motive.  Accordingly, the Court finds that summary

judgment is not appropriate on Chollett's workers compensation retaliation claim

## Conclusion

For the reasons set forth above, Defendant Patterson-UTI Drilling Services, LP, LLLP's

Motion for Summary Judgment is GRANTED in part and DENIED in part.

It is so ORDERED.

Signed this 1st day of December, 2009.

JOHN D. RAINEY
UNITED STATES DISTRICT JUDGE