**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**VICTORIA DIVISION**

| | | |
|---|---|---|
| **GARY R. CHOLLETT,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. V-08-27** |
| | § | |
| **PATTERSON-UTI DRILLING** | § | |
| **SERVICES, LP, LLLP,** | § | |
| | § | |
| **Defendant.** | § | |

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Plaintiff Gary Chollett's ("Plaintiff" or "Chollett") Motion to Enter Judgment on the Jury's Verdict.  (Dkt. No. 81).  Having considered the motion, response, reply, record, and relevant law, the Court finds that the motion should be GRANTED in part and DENIED in part.

### Factual and Procedural History

On April 2, 2010, the jury returned a verdict in favor of Plaintiff and against Defendant Patterson-UTI Drilling Company, LLC ("Defendant" or "Patterson") on Plaintiff's claim of disability discrimination under the Americans with Disabilities Act.  (Dkt. No. 81, Ex. A).  The jury awarded $121,288.00 for back pay, $50,000.00 for compensatory damages in the past, $50,000.00 for compensatory damages in the future, and $167,000.00 as an advisory verdict for front pay, for a total amount of $388,288.00.  (*Id.*).  Plaintiff now asks the Court to enter judgment on the jury's verdict.  (Dkt. No. 81).

### Back Pay

The jury awarded $121,288.00 in back pay.  (Dkt. No. 81, Ex. A).  However, Defendant argues that the amount awarded by the jury either is not supported by the evidence or must be

reduced.

"Back pay is an equitable remedy that is within the sound discretion of the district court." *Manuel v. Tex. State Tech. Coll.*, 294 F. App'x 852, 854 (5th Cir. 2008) (citing *Sellers v. Delgado Coll.*, 902 F.2d 1189, 1193 (5th Cir. 1990)).  Absent "exceptional circumstances," back pay should always be awarded when a statutory violation is found.  *See Sellers v. Delgado Cmty. Coll.*, 839 F.2d 1132 (5th Cir. 1988).  "Generally, the jury's assessment of damages is entitled to considerable deference, and will be disturbed only when the award clearly exceeds the amount to which any reasonable man could feel the claimant is entitled."  *Ramirez v. Allright Parking El Paso, Inc.*, 970 F.2d 1372, 1378 (5th Cir. 1992) (citation omitted).  Further, "uncertainty in determining what an employee would have earned but for discrimination should be resolved against the employer."  *Carter v. Shop Rite Foods, Inc.*, 503 F. Supp. 680, 687 (N.D. Tex. 1980) (citing *United States v. United States Steel Corp.*, 520 F.2d 1043, 1050 (5th Cir. 1975)).  However, even though "the district court should defer to the jury's findings, a court abuses its discretion when it enters a judgment on a verdict usupported by evidence."  *Vaughn v. Sabine Cnty.*, 104 F. App'x 980, 985 (5th Cir. 2004).

Defendant first argues that Plaintiff was medically restricted from working for most of the back pay period and should not receive back pay during the time he was on medical restrictions.  However, this argument fails to recognize Plaintiff's treating physician's testimony.  Dr. Solcher, Plaintiff's physician, indicated that if Plaintiff had requested a full-duty release to return to work, Dr. Solcher would have provided such a release.  (Dkt. No. 90, Ex. D at 93-96 ("If [Plaintiff] wanted to work with [the discomfort], it's fine"; "But what happens is when he—when he had this restriction, if he comes in earlier for his appointment, then, you know, if

2

he wants to do full duty, we can—we can release him earlier.")).

Accordingly, the jury could have found that if at any point Plaintiff had sought a full-duty release, Dr. Solcher would have granted his request. However, when Defendant discharged Plaintiff and Plaintiff was unable to locate any other work in the oilfield, Plaintiff had no reason to request a full-duty release from Dr. Solcher. Moreover, Plaintiff actually worked hard manual labor jobs for almost the entire back pay period, including hauling scrap iron, hauling lumber, painting, carpenter work, and electrical work. (Dkt. No. 90, Ex. A at 84, 88, 90-91).

Defendant next argues that Plaintiff cannot recover back pay for certain periods of time because Plaintiff's position was eliminated due to Rig 528, the rig Plaintiff worked on, being "stacked" and the recession. *See* (Dkt. No. 84, Ex. 1 at 281).

However, evidence was adduced at trial that Plaintiff is very experienced in the oilfield industry and that, because of his experience, he would have remained working for Defendant despite the economic conditions and temporary "stacking" of Rig 528. (*Id.*). Plaintiff was an extremely experienced oilfield worker, having worked essentially every position on the rig and spending over thirty years in the industry. (Dkt. No. 90, Ex. A at 8-10). Plaintiff testified that he was sure he would have still been working for Defendant after the rig count decreased. (Dkt. No. 84, Ex. 1 at 281). Even Defendant's employees testified that Plaintiff was a valuable employee and a hard worker, the type of worker a company would want to keep during slow economic times. Plaintiff's relationship with Defendant dated back to 1987. (Dkt. No. 84, Ex. 3). Accordingly, there is ample evidence for the jury to believe that, but for his termination, Plaintiff would have remained employed with Defendant.

Defendant next argues that Plaintiff cannot recover back pay because the evidence

3

established that Plaintiff has never held a job for as long as the back pay period.  Plaintiff was

awarded approximately 33 months of back pay, and the longest job he has held in his nearly 40

years of working is 25 months.  (Dkt. No. 84, Ex. 3, Ex. 1 at 279).  The longest period Plaintiff

worked for Defendant, consecutively, was 20 months.  (*Id.*).  Defendant argues that Plaintiff's

back pay should be remitted to, at most, 20 months.

However, Defendant has pointed the Court to no authority mandating such a result, and

the Court is not aware of any such authority.  The jury heard testimony and received evidence of

Plaintiff's work history.  After hearing that evidence, the jury concluded that Plaintiff would

have worked during this time period had he not been wrongfully discharged by Defendant.  (Dkt.

No. 81, Ex. A at 7 ("What sum of money, if any, if paid now in cash, would fairly and

reasonably compensate plaintiff for his damages, if any, that resulted from the discrimination of

Plaintiff by Defendant"; "'Back Pay' is the amount of wages and employment benefits that

plaintiff would have earned if he had not been subjected to his employer's unlawful conduct less

any wages he received in the interim.")).

Defendant next argues that the back pay award was based on the unreliable opinion of

Dr. Kent Gilbreath, Plaintiff's economist.  Defendant argues that Dr. Gilbreath's testimony is

unreliable because he did not review Plaintiff's actual employment history, consider that

Defendant's rig counts dropped, account for the fact that rigs "stacked" periodically, give weight

to Plaintiff's diabetes, or interview Plaintiff or read his deposition testimony or declaration.

(Dkt. No. 84, Ex. 4).

The Court does not find Dr. Gilbreath's testimony unreliable.  Dr. Gilbreath has taught

economics at Baylor University for 37 years, served as an expert economist for over 32 years,

published multiple articles on forensic economics, and acted as a reviewer for three economics journals in the field of forensic economics.  (Dkt. No. 90, Ex. C at 7-12, 143-44).  Dr. Gilbreath used Plaintiff's personal income history to calculate his lost income.  (Dkt. No. 90, Ex. C at 86). He took the average of Plaintiff's wages over a three year period, 2005 to 2007, to calculate a base income for projecting future earning capacity.  (*Id.* at 44-45, 49, 148, 151).  Dr. Gilbreath testified that the three years preceding Plaintiff's termination would be indicative of Plaintiff's earning capacity in the future.  (*Id.* at 64).  Dr. Gilbreath also accounted for the decreases in the number of rigs and the fact that rigs "stacked."  He stated that using averages over time embraces the times when there is unemployment and the times when there is not.  (*Id.* at 134). Accordingly, the base income calculated by Dr. Gilbreath embodies times of unemployment or non-wage earning periods.  The Court finds that Defendant's argument regarding Dr. Gilbreath's testimony is without merit and that Dr. Gilbreath's testimony was reliable.

Accordingly, the Court finds that the jury's back pay award is supported by the evidence and judgment should be entered for back pay in the amount of $121,288.00.

## Compensatory Damages in the Past

The jury awarded past compensatory damages in the amount of $50,000.  (Dkt. No. 81, Ex. A at 7).

Courts should review jury damage awards for intangible harm with deference because "the harm is subjective and evaluating it depends considerably on the demeanor of witnesses." *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 487-88 (5th Cir. 2001).  However, "to merit any award greater than nominal damages, emotional distress damages must 'be supported by competent evidence concerning the injury.'" *Id.*  "[I]n this circuit, compensatory damages for emotional

5

distress and other forms of intangible injury will not be presumed from mere violation of constitutional or statutory rights." *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 417 (5th Cir. 1998); *see also Vadie v. Miss. State Univ.*, 218 F.3d 365, 376 (5th Cir. 2000).  Instead, specific individualized proof is necessary, and a claimant's testimony alone may not be sufficient to support anything more than a nominal damage award, as plaintiff's are required to prove damages for mental anguish and suffering to a degree of specificity that may include corroborating testimony.[1]  *Allison*, 151 F.3d at 417; *Oden v. Oktibbeha Cnty., Miss.*, 246 F.3d 458, 470 (5th Cir. 2001) (citations omitted);  *Patterson v. P.H.P. Healthcare Corp.*, 90 F.3d 927, 940 (5th Cir. 1996) (stating that mental anguish damages in employment cases cannot be recovered unless the specificity requirements established in *Carey v. Piphus*, 435 U.S. 247, 264 (1978), are satisfied, which requires the claimant to show "some specific discernable injury to the claimant's emotional state").

"'[H]urt feelings, anger and frustration are part of life . . . and [are] not the types of harm that could support a mental anguish award.  Damages for emotional distress may be appropriate, however, where the plaintiff suffers sleeplessness, anxiety, stress, marital problems, and humiliation." *Salinas v. O'Neill*, 286 F.3d 827, 832 (5th Cir. 2002).  However, "[n]o bright-line rule can take account of the variety of evidence and context presented by [cases involving emotional damage awards]." *Id.*

In this case, the mental anguish evidence was that Plaintiff was humiliated because of the loss of his job.  Cathy Chollett, Plaintiff's wife, testified that Plaintiff loved the oilfield.  (Dkt.

---

[1]However, the Fifth Circuit has "not required corroborating testimony and medical evidence in every case involving nonpecuniary compensatory damages." *Oden v. Oktibbeha Cnty., Miss.*, 246 F.3d 458, 470 (5th Cir. 2001).  The testimony of a plaintiff alone can support emotional damages. *Williams v. Trader Publ'g Co.*, 218 F.3d 481, 486 (5th Cir. 2000)

No. 90, Ex. B ("Gary enjoyed—he lived for it.  It's a part of him.  He's proud of what he does.

He enjoys what he does.  He loves it.  If he doesn't smell like an oil field, he's not happy.  I

mean, it's just a part of his blood.")).  After Plaintiff lost his job in the oilfield, his loss of self

esteem caused him humiliation.  Plaintiff was the primary breadwinner in his family, (*Id.* at 10-

11), and Plaintiff and his wife testified about Plaintiff's struggle to provide for his family after he

lost his job.  Plaintiff picked up scrap iron from various job sites and drilling rigs.  (Dkt. No. 90,

Ex A at 84-87).  Plaintiff got most of "the junk off Patterson rigs," (*Id.* at 85), but that came to a

stop after Defendant's safety man, Titus Clifton, observed Plaintiff at a rig picking up scrap

metal, (*Id.* at 85-86), causing Plaintiff further humiliation.  Additional evidence of Plaintiff's

humiliation was presented when Plaintiff and his wife testified that Plaintiff, his wife, and four

grandchildren had to leave their home and live with a friend in East Texas.  (*Id.* at 89-90).

Plaintiff was humiliated when his electricity and telephone were cut off and his furniture was

repossessed.  (*Id.*; Dkt. No. 90, Ex. B at 6-7).

Plaintiff's discovery of a "handover note" at the rig site that said "Pa-Pa needs a full-duty

release to return to work.  Find any reason not for rehire. (Office),"[2] (Dkt. No. 90, Ex. A at 208),

made him angry and and caused him to feel like Defendant was out to get him.  Plaintiff testified

that all of this disturbed him greatly.  (Dkt. No. 90, Ex. A at 97).  Plaintiff's wife testified that

Plaintiff's humiliation could be seen through his interaction with his grandchildren.  (Dkt. No.

90, Ex. B at 7 ("[H]e would just lay around and not even—I mean, they were going to try to play

with him and he just wanted nothing to do with them because he was—you know, he didn't want

them to feel what he was feeling.")).

---

[2]Plaintiff's nickname was Pa-Pa.

Evidence was also presented about Plaintiff's sleep problems.  Plaintiff testified that he would "fall asleep and wake up, fall asleep and wake up.  It would stay like that night after night."  (Dkt. No. 90, Ex. A at 97).  Plaintiff's wife testified that she would wake up in the night with the grandchildren and find Plaintiff sitting in his chair in the living room in the early morning hours, unable to sleep.  (Dkt. No. 90, Ex. B at 5-6).

Evidence was also presented that Plaintiff experienced anxiety and stress because of his job loss.  Plaintiff testified that he experienced stress as a result of his situation and that his diabetes went out of control as a result of the stress.  (Dkt. No. 90, Ex. A at 98-99).  Plaintiff's wife also testified about Plaintiff's stress and his resulting blood sugar problems, noting that Plaintiff had to delay a surgery because of his blood sugar problems.  (Dkt. No. 90, Ex. B at 11).

Plaintiff testified that his mental anguish "caused his health to drop" and resulted in a loss of desire to fish, read, or work around his house.  (Dkt. No. 84, Ex. 1 at 285-86).  Plaintiff's wife testified that Plaintiff lost his spark after he lost his job and that he would just lie around and not interact with his grandchildren.  (Dkt. No. 90, Ex. B at 7).  Plaintiff's wife testified that she tried to get Plaintiff to see a counselor, but they did not have enough money to pay for one, so Plaintiff tried to "work on it himself."  (*Id.* at 12).  Plaintiff's wife stated, when asked to summarize the affect of Plaintiff's termination on his overall well being and emotional mental health, that "To me Gary is an upbeat person, he's always busy, he's always doing things.  And this just actually just something like a—just hit him like a board and a brick and anything else, I mean, just like, wham, there's no—'where's my life'?"  (*Id.* at 12).

Plaintiff and his wife also testified that Plaintiff lost weight as a result of his mental state.  (Dkt. No. 84, Ex. 1 at 98; Dkt. No. 90, Ex. B at 6).  Both viewed Plaintiff's loss of appetite and

loss of 50 pounds as a negative development.

Defendant argues that "[a] survey of Fifth Circuit cases demonstrates that the foregoing is insufficient to support anything but a nominal compensatory damages award," (Dkt. No. 84 at 11), and that the "highest award sustained by the Fifth Circuit for this type of evidence . . . was $20,000," (*Id.* at 12).  However, the Fifth Circuit has sustained numerous awards equal to or greater than the $50,000 awarded to Plaintiff on similar facts to those presented here.

The Court finds that, after surveying cases involving similar evidence and similar awards, that the jury's award of past compensatory damages in the amount of $50,000 is not excessive and is specifically supported by competent evidence.  *See Thomas v. Tex. Dep't of Criminal Justice*, 297 F.3d 361, 369 (5th Cir. 2002) (reviewing six-figure emotional distress awards approved by the Fifth Circuit) (citing *Forsyth v. City of Dallas*, 91 F.3d 769, 774 (5th Cir. 1996) (upholding awards of $100,000 and $75,000, respectively, on evidence from the first plaintiff that described "depression, weight loss, intestinal troubles, . . . marital problems," and consulting a psychologist and evidence from the second plaintiff that he "suffered depression, sleeplessness, and marital problems"); *Rizzo v. Children's World Learning Ctrs., Inc.*, 173 F.3d 254, 262 (5th Cir. 1999) (approving a $100,000 award under the ADA for past and future mental aguish, which was 550 times the size of the lost wages award, although the panel did not discuss the specifics of the plaintiff's emotional damages); *Williams v. Trader Publ'g Co.*, 218 F.3d 481, 486 (5th Cir. 2000) (upholding a compensatory damage award of $100,000 for emotional distress based only on the plaintiff's descriptions of "severe emotional distress," "sleep loss," "severe loss of weight," and "beginning smoking"); *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 488 (5th Cir. 2001) (remitting an emotional damage award to $100,000 where plaintiff testified about his sleeping

trouble, headaches, marital difficulties, and loss of prestige and social connections and plaintiff's

coworker testified that plaintiff "appeared despondent, depressed, down, and absolutely utterly

discouraged about not being able to go back to work")[3]; *Salinas v. O'Neill*, 286 F.3d 827, 829-

30, 832 (5th Cir. 2002) (remitting a jury award to $100,000 where plaintiff and his wife testified

that defendant's retaliation caused plaintiff "loss of self esteem, feelings of not being a

competent agent, loss of sleep, stress, paranoia, fear of future retaliation, and high blood

pressure"; plaintiff also testified to "using 'lots' of sick leave and visiting physicians more than

seventy times and spoke of his deteriorating relations with his wife and son"; plaintiff's wife

"corroborated all of these specifics"))[4]; *Denner v. Tex. Dep't of Criminal Justice*, No. SA-05-

CA-184-XR, 2006 WL 2987719, at *7-8 (W.D. Tex. Oct. 16, 2006) (awarding $75,000 in

compensatory damages with facts similar to the case at hand where "Plaintiff [and her mother]

testified that she was humiliated and that she suffered sleeplessness, irritability, and

nervousness."); *Tureaud v. Grambling State Univ.*, 294 Fed. App'x. 909, 916 (5th Cir. 2008)

(approving compensatory damage award of $140,000 in a discrimination case based on

plaintiff's testimony that discharge was "'emotionally embarrassing' and 'painful experience'

that caused him to be 'deeply hurt'"; plaintiff also testified that he "gained 'quite a bit' of

weight, was stressed, 'had the blues,'" and was unable to gain suitable employment after his

discharge). *But see Vadie v. Miss. State Univ.*, 218 F.3d 365, 375-78 (5th Cir. 2000) (remitting a

Title VII award of $300,000 to $10,000, emphasizing that the sole source of evidence, plaintiff's

---

[3] The panel increased the emotional damage award by a 50% multiplier, which resulted in a final award of $150,000. *Giles*, 245 F.3d at 489.

[4] The *Salinas* panel also applied the 50% multiplier, rendering a final award of $150,000 and stated that "[w]e stress that this amount is neither the minimum nor the maximum for emotional damage claims in discrimination claims. Nor is this amount a floor or ceiling for such claims supported by the testimony of a plaintiff and spouse. All this figure represents is the last dollar amount Salinas can be awarded based on the evidence presented for the damages he suffered before that amount would be excessive as a matter of law." *Salinas*, 286 F.3d at 833.

brief testimony, was insufficient to support the verdict on emotional injury; plaintiff's entire

testimony regarding emotional damages was that "It destroyed me.  It totally ruined me, and I

become sick, totally ill, physically, mentally, and everything.  I took many doctors, many pills.  I

did not know what to do, where to go, what to say.  I did not know whether it was nighttime or

daytime.  I could not sleep for months at a time.  Headache, nausea.  Still I am under severe

doctor surveillance because of what they have done to me").[5]

**Compensatory Damages in the Future**

The jury awarded Plaintiff $50,000 for compensatory damages in the future.  (Dkt. No.

81, Ex. A at 7).

"To recover damages for future mental anguish, a plaintiff must present evidence

demonstrating a reasonable probability that the plaintiff will suffer compensable mental anguish

in the future." *Wackman v. Rubsamen*, 602 F.3d 391, 408 (5th Cir. 2010).

Defendant claims that Plaintiff failed to produce any evidence of future compensatory

damages and that any future mental anguish will be alleviated because Mark Cullifer testified

that Plaintiff could return to work, which would alleviate Plaintiff's financial stress.

In *Thomas v. Tex. Dep't of Criminal Justice*, 297 F.3d 361 (5th Cir. 2002), the Fifth

Circuit considered an award of $100,000 for future emotional damages.  *Id.*  at 367.  The court

reduced the $100,000 award for future damages to $50,000 and then applied the multiplier of

50% to increase the award to $75,000.  *Id.* at 371-72.  In discussing future damages, the *Thomas*

court was concerned that the jury had awarded over three times the amount of the past damages

in awarding the future damages, despite the fact that the evidence indicated that the plaintiff's

emotional difficulties had subsided.  *Id.* at 370-71.  The plaintiff in *Thomas* testified that "she

---

[5]The panel noted that if plaintiff declined remittitur and chose a new trial, plaintiff may be able to "make a better record substantiating his claims of injury."  *Vadie*, 218 F.3d at 378.

currently enjoys her job" and that "[a]lthough she has given up hope of future promotions, she still derives great pleasure from helping others at work." *Id.* at 371. The *Thomas* plaintiff "admitted that she has received favorable evaluations; she has been named employee of the month. She has continued to pursue her degree at Sam Houston University, where she originally began taking classes to further her career ambitions." *Id.* While the "evidence pointed to some ongoing and future emotional distress, . . . [it was] nothing as severe as what [plaintiff] suffered during the retaliatory period." *Id.*

In this case, unlike *Thomas*, Plaintiff still had not found a job in the oilfield, and the evidence suggests that it is unlikely that Plaintiff will find a job in the oilfield, despite Mark Cullifer's statement that Plaintiff could return to work for Defendant—which the jury disbelieved, as judged by its front pay award. (Dkt. No. 81, Ex. A at 7 ("Front Pay" is that amount of wages and employment benefits that plaintiff would likely earn in the future (from now forward) had he not been discharged by defendant less any wages that defendant proves he will likely earn during that same period in the future.")).

Because Plaintiff does not have a job in the oilfield, evidence was presented that he would continue to suffer mental anguish damages from the loss of the occupation he loved. (Dkt. No. 90, Ex. B at 4 ("Gary enjoyed—he lived for it. It's a part of him. He's proud of what he does. he enjoys what he does. He loves it. If he doesn't smell like an oil field, he's not happy. I mean, it's just a part of his blood.")). There is also evidence that Plaintiff will continue to suffer humiliation, as he is unable to continue in his chosen profession. (*Id.*).

There is also evidence that Plaintiff's sleeping problems are ongoing, and may extend into the future. *See* (*Id.* at 5-6). Evidence was presented that Defendant displayed hostility toward Plaintiff, as evidenced by Plaintiff being banned from picking up junk iron at

Defendant's rigs and Defendant interfering with Plaintiff's employment prospects in the oilfield. It is reasonable for the jury to believe that this hostility will continue in the future, causing plaintiff further stress as he is prevented from working on a drilling rig.  (Dkt. no. 90, Ex. A at 81-87, 208-09, 291; Dkt. No. 90, Ex. B at 9-10).

Moreover, in *Rizzo v. Children's World Learning Ctrs., Inc.*, 173 F.3d 254 (5th Cir. 1999), the Fifth Circuit approved an award of $100,000 for past and future mental anguish damages—jointly—in a discrimination case.  *Id.* at 262.  The *Rizzo* court noted that the jury found that the defendant acted with malice and stated, "[i]n short, we cannot say that an award of $100,000 for mental anguish resulting from <u>malicious</u> discrimination in violation of the ADA is enough to 'shock the conscience' of this Court."  *Id.* (emphasis added).  In this case, the jury found that Defendant engaged in a violation of the ADA with "malice or with reckless indifference to the right of Plaintiff to be free from such practice."  (Dkt. No. 81, Ex. A at 8).

Accordingly, the Court finds that the jury's award of $50,000 for future compensatory damages is not excessive and is specifically supported by competent evidence.

### Front Pay

The jury answered an advisory question on the issue of front pay, awarding future damages in the amount of $167,000.  (Dkt. No. 81, Ex. A at 7);  *Mota v. Univ of Tex. Houston Health Sci. Ctr.*, 261 F.3d 512, 526 (5th Cir. 2001) ("Although front pay is an equitable remedy for the district court to determine, the court may empanel an advisory jury.").  Defendant argues that this amount is not supported by the evidence and that Plaintiff has failed to make the proper showing for an award of front pay.

Reinstatement is the preferred remedy for a discriminatory employment practice. *Deloach v. Delchamps, Inc.*, 897 F.2d 815, 822 (5th Cir. 1990).  However, if reinstatement is not

feasible, the court may make an equitable award of front pay. *Id.* An award of front pay compensates a victim of discrimination for lost future wages and benefits. *Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 44 (5th Cir. 1992).

## A. Reinstatement

In determining the feasibility of reinstatement, a district court can consider whether the plaintiff has changed careers, whether animosity exits between the plaintiff and his former employer, whether reinstatement would require an employer to displace an existing employee, and whether positions now exist comparable to plaintiff's former position *Palasota v. Haggar Clothing Co.*, 499 F.3d 474, 489 (5th Cir. 2007); *Ray v. Iuka Special Mun. Separate Sch. Dist.*, 51 F.3d 1246, 1254-55 (5th Cir. 1995). A court is not required to analyze each and every factor, and can determine whether reinstatement is feasible simply based on whether "a hostile relationship exists between the employer and the plaintiff." *See, e.g., Mota*, 261 F.3d at 526. Plaintiff has the burden of establishing that reinstatement is not feasible. *See Hansard v. Pepsi-Cola Metro. Bottling Co., Inc.*, 865 F.2d 1461, 1469 (5th Cir. 1989).

Despite Defendant's claim that there is no evidence of animosity between Plaintiff and Defendant, Plaintiff has presented evidence of Plaintiff's bitterness and ill will toward Defendant and Defendant's dislike of Plaintiff. At trial, the jury heard evidence that Plaintiff found a note at Rig 528 that was penned by rig manager T.J. Styra that said "Pa-Pa needs a full-duty release to return to work. Find any reason not for rehire. (Office)," (Dkt. No. 90, Ex. A at 208-09). Plaintiff was "angry" when he saw the note and believed Defendant was out to get him. (*Id.*). Mark Cullifer was the person who made the decision to discharge Plaintiff in July 2007, and he is still employed by Defendant. (Dkt. No. 79 at 212-13). Plaintiff testified at trial he was still upset with Defendant and Mark Cullifer. (*Id.* at 213).

14

The evidence presented at trial suggests that Plaintiff believes Defendant prevented him from obtaining any job in the drilling industry.  *See Palasota v. Haggar Clothing Co.*, 499 F.3d 474, 490 (5th Cir. 2007) (stating that "record suggests some lingering animosity between the parties" because, among other things, plaintiff alleged that defendant's "management attempted to black-ball him in the industry").  Shortly following Plaintiff's discharge, Plaintiff sought employment at other drilling companies.  (Dkt. No. 90, Ex. at P at 291).  Based on Plaintiff's experience, rig managers from different companies talk with each other about employees.  (*Id.*).  Even though Plaintiff was a highly experienced rig hand, and despite the fact that the oilfield was booming at the time, no one would hire Plaintiff.  (*Id.*; Dkt. No. 90, Ex. B at 9-10).

Evidence of animosity was also displayed when testimony was presented that Defendant prevented Plaintiff from picking up scrap metal from Defendant's rigs.  (Dkt. No. 90, Ex. A at 84-87).  After Defendant's safety man saw Plaintiff hauling scrap metal from one of Defendant's rigs, the toolpushers informed Plaintiff that Defendant would no longer allow Plaintiff to pick up scrap metal.  (*Id.* at 86-87).

Because of the animosity that exists between Plaintiff and Defendant, the Court finds that reinstatement is not feasible.

**B. Front Pay**

Front pay constitutes a "prospective make-whole remedy" and "can only be calculated through intelligent guesswork."  *Deloach v. Delchamps, Inc.*, 897 F.2d 815, 822 (5th Cir. 1990).  Because of its speculative nature, district courts have wide latitude in determining front pay awards.  *Id.* (finding an award covering a five-year period within the court's discretion).  When deciding whether to make a front pay award, courts have considered factors such as: 1) the length of prior employment, 2) the permanency of the position held, 3) the nature of work, 4) the

age and physical condition of the employee, and 5) the possible consolidation of jobs and the myriad other non-discriminatory factors which could validly affect the possible employment relationship. *Reneau v. Wayne Griffin & Sons, Inc.*, 945 F.2d 869, 871 (5th Cir. 1991). Front pay awards must be "carefully crafted to avoid a windfall to the plaintiff," as damages for employment discrimination are not meant to be punitive. *Palasota v. Haggar Clothing Co.*, 499 F.3d 474, 491 (5th Cir. 2007).

Dr. Gilbreath testified that Plaintiff's lost future income from the date of trial until his retirement, which Dr. Gilbreath placed at 2015, (Dkt. No. 84, Ex. 3 at 115), was approximately $245,000. (Dkt. No. 90, Ex. C at 148-153). No other experts testified regarding damages.

With respect to the first factor, Plaintiff has worked for Defendant since 2001, except for one year Plaintiff spent with another drilling company. (Dkt. 84, Ex. 3). While Plaintiff's time with Defendant was not consecutive, it was consistent. For instance, Plaintiff worked for Defendant from May 2004 to December 2004, resuming his work with Defendant from January 2005 to August 2006. After Plaintiff left his job with Defendant in August 2006, he returned to Defendant in November 2006 and stayed until June 2007. (*Id.*). *See Downey v. Strain*, 510 F.3d 534, 545 (5th Cir. 2007) (affirming district court's award of two years of front pay because of the "likelihood that the political nature of the sheriff's office could impact the permanency of [plaintiff]'s job," as that is part of "the 'intelligent guesswork'" the district court must conduct); *Burns v. Tex. City Refining, Inc.*, 890 F.2d 747, 753 n. 4 (5th Cir. 1989) ("Awards of front pay are necessarily speculative in nature. If the court awards front pay for the remainder of the plaintiff's working life, it must presume the plaintiff would have remained in the defendant's employ all during that time. The longer the front pay period, the more speculative the front pay award").

16

With respect to the second, third, and fifth factors, Defendant points out that floorhand positions are not permanent, as rigs "stack" from time to time and Plaintiff bounced between several drilling companies.  (Dkt. No. 84, Ex. 1 at 315-16; Dkt. 84, Ex. 3).  Moreover, the recession caused a decrease in the number of rigs in the Victoria region, resulting in the layoff of many of Defendant's employees, including most floorhands.  (Dkt. No. 84, Ex. 1 at 280-82).  On the other hand, the evidence at trial established that Plaintiff was an extremely experienced and hard-working rig hand.  (Dkt. No. 90, Ex. A at 8-10).  Plaintiff testified that based upon his experience, he was extremely confident he would have remained as an employee of Defendant during any down market conditions.  (Dkt. No. 84, Ex. 1 at 280-82).  Further, Mark Cullifer testified at trial that floorhand positions currently exist and Plaintiff was welcome to return to work.

Defendant argues the fourth factor weighs against awarding front pay, as Plaintiff would eventually be restricted from floorhand work due to his shoulder getting sore or his diabetes. (Dkt. No. 84, Ex. 1 at 177 (describing Plaintiff's testimony that when he returned to the rig in January 2007 he wanted an easier job off the rig)).  No evidence was presented at trial that Plaintiff's diabetes condition would prevent him from working after the trial date, but evidence was presented that Plaintiff wanted to find an easier job.  (*Id.*).

Having heard all the evidence in the case, the jury rejected the amount calculated by Dr. Gilbreath and reduced the front pay award to $167,000.  However, because of the nature of drilling rig work and because of the evidence of Plaintiff's desire for easier work, the Court finds that $67,000 is a fair and equitable compensation to Plaintiff for loss of future pay.

## Conclusion

For the reasons articulated above, judgment should be entered on the jury's verdict.

17

Plaintiff shall be awarded $121,288.00 for back pay, $50,000.00 for compensatory damages in the past, $50,000.00 for compensatory damages in the future, and $67,000.00 in damages for front pay, for a total amount of $288,288.00.

      The Court will award prejudgment interest on the sum awarded for back pay and past compensatory damages at the rate of 0.26%, to be paid from the day of filing through the date judgment is signed.

      Postjudgment interest shall be payable on all of the above amounts at the rate allowable by law.

      A separate judgment shall be entered in accordance with the above findings.

      The Court will consider an award of attorney fees and related expenses to Plaintiff by separate order and Plaintiff's attorneys are ordered to submit motions for fees and expenses within 14 days of the entry of this judgment.

      It is so ORDERED.

      Signed this 14th day of September, 2010.

JOHN D. RAINEY
SENIOR U.S. DISTRICT JUDGE