UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
VICTORIA DIVISION

| | | |
|---|---|---|
| GARY R. CHOLLETT, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. V-08-27 |
| | § | |
| PATTERSON-UTI DRILLING SERVICES, | § | |
| LP, LLLP, | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM OPINION & ORDER

Pending before the Court is Defendant Patterson-UTI Drilling Services, LP, LLLP's ("Patterson" or "Defendant") Renewed Motion for Judgment as a Matter of Law (JMOL) and Alternatively for a New Trial (Dkt. No. 97), to which Plaintiff Gary R. Chollett ("Chollett" or "Plaintiff") has responded (Dkt. No. 102) and Patterson has replied (Dkt. No. 103). Having considered the motion, response, reply, record, and applicable law, the Court is of the opinion that Patterson's motion for JMOL should be **GRANTED**.

## I. Procedural Background

Chollett brought this lawsuit against Patterson on April 3, 2008 alleging violations of the Family and Medical Leave Act (FMLA), the Americans with Disabilities Act (ADA), the Texas Commission on Human Rights Act (TCHRA), and § 451 of the Texas Labor Code. (Dkt. No. 1.) On December 1, 2009, the Court entered a Memorandum Opinion and Order granting Patterson's Motion for Summary Judgment as to Chollett's FMLA claim and denying the motion as to his worker's compensation retaliation claim and ADA claim. (Dkt. No. 28.) During a jury trial in March 2010, Patterson moved for judgment as a matter of law (JMOL), which the Court denied from the bench. At the close of trial, the jury failed to find any worker's compensation retaliation

1

but found for Plaintiff on the ADA claim and awarded damages.[1] (Dkt. No. 75.) On September 14, 2010, the Court granted judgment on the verdict with modification of the amount of front pay and entered final judgment in favor of Chollett. (Dkt. Nos. 93 & 94.) Patterson now renews its motion for JMOL and, in the alternative, moves for a new trial. (Dkt. No. 97.)

## II. Factual Background

Over the years, Chollett worked off and on for Patterson as a roughneck on a drilling rig. Specifically, Chollett held the position of motorman, which involved very heavy manual labor, including repeatedly lifting and carrying 100 pounds. On July 31, 2005, Chollett fractured his left shoulder blade on the job. Chollett's physician, Dr. Solcher, gave him a light-duty work restriction, which Patterson accommodated by creating a light-duty position. During the next thirteen months, Chollett remained on light duty and had two out-patient surgeries. During this time, Patterson hired an extra hand on the rig to do the heavy lifting that Chollett could not perform because of his restrictions. Then on August 12, 2006, Chollett aggravated his shoulder injury. After meeting with Chollett on August 17, 2006, Dr. Solcher, imposed additional light-duty work restrictions on Chollett, and Patterson immediately terminated Chollett's employment. Patterson's stated reason for the termination was that it has a six-month cap on the amount of time an employee is permitted to work light duty for a work-related injury. However, Chollett was informed that he could contact Patterson about returning to work when he received a full-duty release.

In November 2006, Chollett was given a zero percent impairment rating. Chollett was then rehired in December 2006 and worked several months without any restrictions. At some point after Chollett was reinstated, he informed Patterson that he wanted off the rig and out of the motorman position so that he could be transferred to an "easier job," such as yardman or safety

---

1. Chollett voluntarily dismissed his claims under the TCHRA at trial.

man. Chollett admitted, however, that there were no open yardman or safety man positions at Patterson from August 2006 through July 2007.

When Chollet started having problems with his shoulder again in June 2007, safety supervisor Titus Clifton told Chollett to go see his doctor about the soreness. As a result, Dr. Solcher imposed light-duty restrictions on July 6, 2007, which included a lifting restriction of 50 pounds at least through August 1, 2007. The same day Chollett received the restricted-duty release from his doctor, he called T.J. Styra, his rig manager on Rig 528. When Chollett called Styra again a few days later, Styra told Chollett that when he got a full-duty release, he should call Clifton. Styra also told Chollett that if he couldn't reach Clifton, he should call Walter Koricanek, the drilling superintendent for the Victoria region where Chollett worked.

Chollett then called Koricanek, who directed Chollett to go to Rig 528 and relieve Thomas Parker, who was watching the rig. Rig 528 was idle or "stacked" at the time, and when Chollett arrived, Parker was the only one there. Parker then told Chollett to call Clifton. Chollett called Clifton and was told that he could not return to work without a full-duty release. Chollett testified at trial that after making this phone call to Clifton he observed, in plain view, the "hand over notes" for the rig, which stated that "Pa-Pa needs full release to return—find excuse for him not to be rehired (office)." Chollett's nickname is Pa-Pa. Chollett claims that the note was written by Styra, as Chollett is familiar with and recognizes Styra's handwriting.

Chollett obtained a full-duty release from Dr. Solcher on July 19, 2007. Chollett testified that he faxed the release to Clifton, but Clifton did not respond. Chollett did not provide a copy of the release to rig managers Styra or Ray Borden, however, because he "had no idea where they were." Chollett further testified that, notwithstanding this full-duty release, Patterson would

not allow him to return to work. Instead, Borden completed a Separation Notice September 8, 2007, which was made retroactive to June 30, 2007. Chollett was never rehired by Patterson.

The month after Chollett's last day of work, Chollett filed a Charge of Discrimination with the EEOC, and the EEOC conducted an investigation of Chollett's discrimination claims. The EEOC found that Chollett "did not provide information that would substantiate his allegations." The EEOC determined that Chollett failed to establish a prima facie case of disability discrimination because he did not have a disability under the ADA, was not otherwise qualified because he could not perform the duties of his motorman job, and failed to establish the requisite causal standard.

## III. Legal Standard

### A. Judgment as a Matter of Law

Pursuant to FED. R. CIV. P. 50(a), the Court may grant JMOL during a jury trial once the jury has fully heard evidence on an issue if the Court finds that a "reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50(a)(1); *see also Phillips v. F.D. East*, 81 Fed. App'x 483, 485 (5th Cir. 2003) ("Judgment as a matter of law is granted properly when 'a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'") (quoting *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 149 (2000)).

"A party is entitled to judgment as a matter of law 'only if the evidence points but one way and is susceptible to no reasonable inferences which may support the opposing party's position.'" *Hampton v. Dillard Dep't Stores, Inc.*, 247 F.3d 1091, 1099 (5th Cir. 2001) (quoting *Tyler v. RE/MAX Mountain States, Inc.*, 232 F.3d 808, 812 (10th Cir. 2000)). In deciding whether to grant a JMOL, the Court does not "weigh evidence, judge witness credibility, or

challenge the factual conclusions of the jury. Judgment as a matter of law is appropriate. . . if there is no legally sufficient evidentiary basis for a claim under the controlling law." *Id.* (quoting *Brown v. Gray*, 227 F.3d 1278, 1285 (10th Cir. 2000)). However, the Court must "give credence to . . . that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" See *Reeves*, 530 U.S. at 151 (quoting 9A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2559, p. 300 (2d ed. 1995)). There must be more than a mere scintilla of evidence in the record to render the grant of JMOL inappropriate. *See Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 251 (1986); *Krystek v. Univ. of So. Miss.*, 164 F.3d 251, 255 (5th Cir. 1999).

Finally, even if the Court denies a motion for JMOL during trial, the party may renew its motion following trial. Pursuant to Rule 50(b), the Court may grant judgment as a matter of law following a jury verdict on an issue so long as the motion is filed within 28 days of the entry of judgment. FED. R. CIV. P. 50(b) The renewed motion for judgment as a mater of law may be accompanied by a Rule 59 motion for a new trial. FED. R. CIV. P. 50(b).

**B. New Trial**

Rule 59(a) provides that the Court may grant a new trial "for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States." FED. R. CIV. P. 59. Therefore, the Court may grant a new trial if it finds that the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course. *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 613 (5th Cir. 1985). When a party moves for a new trial on evidentiary grounds, the Court will not grant a new trial unless "the verdict is against the great weight of the evidence." *Pryor v. Trane Co.*, 138 F.3d 1024, 1026 (5th Cir.1998). Courts are to decide whether to grant a new trial based on their

assessment of the fairness of the trial and the reliability of the jury's verdict. *Seidman v. Am. Airlines, Inc.*, 923 F.2d 1134, 1140 (5th Cir. 1991). The decision to grant or deny a motion for new trial lies within the discretion of the Court. *Shows v. Jamison Bedding, Inc.*, 671 F.2d 927, 930 (5th Cir.1982). In determining whether to grant a motion for new trial, the Court must view the evidence in the light most favorable to the jury's verdict, and the verdict must be affirmed unless the evidence points so strongly and overwhelmingly in favor of the other party that the Court believes that reasonable persons could not arrive at a contrary conclusion. *Dawson v. Wal-Mart Stores, Inc.*, 978 F.2d 205, 208 (5th Cir. 1992).

## IV. Analysis

### A. Chollett's *prima facie* case of discrimination

Under the familiar *McDonnell Douglas* framework, Chollett was first required to establish a *prima facie* case of discrimination at trial by showing: (1) he suffered from a disability as defined by the ADA; (2) he was qualified for his job; (3) he experienced an adverse employment action because of his disability; and (4) Patterson replaced him with or treated him less favorably than a non-disabled employee. *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 511 (5th Cir. 2003); *see also McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Assuming Chollett established his *prima facie* case, the burden then shifted to Patterson to articulate a legitimate, non-discriminatory reason for the adverse employment action. *Id.* Once Patterson articulated such a reason, the burden shifted back to Chollett to show that the reason was (1) merely a pretext for unlawful discrimination, or (2) only one of the reasons for Patterson's actions and that another motivating factor was Chollett's disability. *See Id.*; *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004).

### 1. Is Chollett disabled under the ADA?

The threshold issue in Chollett's *prima facie* case is a showing that he suffered from a disability protected by the ADA. *See Hamilton v. Southwestern Bell Telephone Co.*, 136 F.3d 1047, 1050 (5th Cir. 1998); *Bridges v. City of Bossier*, 92 F.3d 329, 332 (5th Cir. 1996). A plaintiff is "disabled" under the ADA if he: (1) has a physical or mental impairment that substantially limits one or more of his major life activities; (2) has a record of such impairment; or (3) is regarded by his employer as having such impairment. 42 U.S.C. § 12102(1).

In response to Question No. 1 on the Verdict Form, the jury found that Chollett was "a qualified individual with a 'disability' at the time of his discharge in July 2007." (Dkt. No. 75.) However, the jury was not asked under which of the three categories Chollett was disabled: actual, record, or perceived. In response to Patterson's motion for JMOL, Chollett contends that he "established at trial that he was a qualified individual with a physical disability that substantially limited the major life activity of 'working,' that he had a record of such impairment, and/or Defendant regarded him as having such an impairment." (Dkt. No. 102 at 3.)

### a. Substantially Limiting Impairment

To be disabled within the meaning of the ADA, Chollett must demonstrate that he has or had a mental or physical impairment that "substantially limits" one or more major life activities. 42 U.S.C. § 12102(2); *see also Ivy v. Jones*, 192 F.3d 514, 516 (5th Cir. 1999) ("The particularized inquiry mandated by the ADA centers on *substantial limitation of major life activities, not mere impairment*.") (emphasis added). An individual is "substantially limited" if he or she is:

> (i) Unable to perform a major life activity that the average person in the general population can perform; or (ii) Significantly restricted as to the condition, manner, or duration under which [he or she] can perform a particular major life activity as

compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1).[2]

The only major life activity that was submitted to the jury was working. With regard to working,

> [S]ubstantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(i). While the Fifth Circuit "has little precedent giving examples of what constitutes a 'class of jobs,' . . . [t]he Supreme Court has summarized these considerations by saying: 'If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs.'" *Tullos v. City of Nassau Bay*, 137 Fed. App'x 638, 648 (5th Cir. 2005) (quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 492 (1999) (superseded on other grounds by the 2008 amendments to the ADA)).[3]

---

2. In determining whether an individual's impairment substantially limits a major life activity, courts should consider: "(i) The nature and severity of the impairment, (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment." 29 C.F.R. § 1630.2(j)(2).

3. In addition to the factors set forth in 29 C.F.R. § 1630.2(j)(2), the Court may also consider the following factors when determining whether an individual is substantially limited in the major life activity of working:

> (A) The geographical area to which the individual has reasonable access;
>
> (B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills, or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or
>
> (C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills, or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

29 C.F.R. § 1630.2(j)(3)(ii).

The only impairment identified by Chollett was his inability to perform heavy lifting from time to time:

> Q: What kind of impairment did you have?
> A: I . . . would need help from time to time picking up things heavy or putting oil in motors or things such as that.
> Q: So you had impairment in your ability to lift?
> A: Yes, sir.

(Pl. Trial Testimony at 92:20-24.) Specifically, for a 13-day period in July 2007, while he was awaiting the results of an MRI after his shoulder gave out, Chollett was restricted from lifting over 50 fifty pounds.

> Q: [C]ould you have been a motorman from July 6th through July 19th, 2007?
> A: Not—nothing over 50 pounds, I couldn't.
> Q: Okay. But that's it, right, you could do everything else. You weren't restricted from anything else, were you?
> A: No.

(*Id.* at 191:12-19.)

The Fifth Circuit has repeatedly stated that temporary impairments are not sufficient to constitute "disabilities" under the ADA. *See, i.e.*, *E.E.O.C. v. Chevron Phillips Chemical Co., LP*, 570 F.3d 606, 619 (5th Cir. 2009) ("Examples of temporary, non-disabling impairments include: 'broken limbs [and] sprained joints . . . .'" (quoting 29 C.F.R. § 1630 app., § 1630.2(j)); *Webster v. Texas Engineering Extension Serv.*, 204 F.3d 1115, 1999 WL 1328093, *3 (5th Cir. 1999) ("We have noted in cases dealing with the Rehabilitation Act . . . that the law contemplates an impairment 'of a continuing nature,' and not simply a temporary restriction.") (quoting *Evans v. City of Dallas*, 861 F.2d 846, 853 (5th Cir. 1988)); *Burch v. Coca-Cola Co.*, 119 F.3d 305, 316 (5th Cir. 1997) ("Permanency, not frequency, is the touchstone of a substantially limiting impairment.").

In considering a similar case involving a plaintiff whose back injury resulted in a temporary restriction on lifting more than 25 pounds, the Fourth Circuit explained:

> Applying the protections of the ADA to temporary impairments, such as the one presented here, would work a significant expansion of the Act. The ADA simply was not designed to protect the public from all adverse effects of ill-health and misfortune. Rather, the ADA was designed to "assure[ ] that truly disabled, but genuinely capable, individuals will not face discrimination in employment because of stereotypes about the insurmountability of their handicaps." *Forrisi* [*v. Bowen*, 794 F.2d 931, 934 (4th Cir. 1986)]. Extending the statutory protections available under the ADA to individuals with broken bones, sprained joints, sore muscles, infectious diseases, or other ailments that temporarily limit an individual's ability to work would trivialize this lofty objective.

*Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 200 (4th Cir. 1997), *overruled on other grounds by Baird v. Rose*, 192 F.3d 462 (4th Cir. 1999).

The Fifth Circuit has also repeatedly stated that limitations on heavy lifting alone are insufficient to constitute impairments that substantially limit an individual's ability to work. *See*, *e.g.*, *Collins v. Saia Motor Freight Lines, Inc.*, 144 Fed. App'x 368, 370—71 (5th Cir. 2005) (restriction on plaintiff's ability to consistently lift more than 50 pounds was insufficient to establish a disability under the ADA); *Bayless v. Orkin Exterminating Co., Inc.*, 2003 WL 21195495, at *4 (5th Cir. May 5, 2003) (employee who was precluded from jobs that required "driving, climbing, and heavy lifting" was not substantially limited in the major life activity of working); *Dupre v. Charter Behavioral Health Systems of Lafayette Inc.*, 242 F.3d 610, 614—15 (5th Cir. 2001) (employee who was capable of "bending at the knees, walking a half mile, [and] lifting up to thirty pounds" was not disabled as to working); *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112, 1120 (5th Cir. 1998) (limitation on heavy lifting alone, but "not the routine duties of daily living[,] . . . is insufficient for a reasonable jury to find a substantial limitation on a major life activity"); *Ray v. Glidden Co.*, 85 F.3d 227, 229 (5th Cir. 1996); ("[I]inability to perform heavy lifting does not render a person substantially limited in the major activities of lifting of

working."); *Dutcher v. Ingalls Shipbuilding*, 53 F.3d 723, 726 (5th Cir. 1995) (Although the plaintiff's "medical expert testified that [she could] do lifting and reaching as long as she avoid[ed] heavy lifting and repetitive rotational movements, . . . there was no evidence offered on which a jury could find that this impairment substantially limited a major life activity.").

Chollett argues that "[t]he idea of a 'disability as a matter of law' is an error," and the Court should not conclude that he was not disabled simply because the Fifth Circuit has previously held that other individuals with similar restrictions on heavy lifting were not disabled. However, in *Pryor v. Trane Co.*, the Fifth Circuit cited with approval a Fourth Circuit case that held that, "*as a matter of law*, . . a twenty-five pound limitation . . . does not constitute a significant restriction on one's ability to lift, work, or perform any other major life activity." 138 F.3d 1024, 1027 (*citing Williams v. Channel Master Satellite Systems, Inc.*, 101 F.3d 346 (4th Cir. 1996)) (emphasis added). Likewise, in *Watkins v. Roadway Express Inc.*, the Fifth Circuit acknowledged that in *Sherrod*:

> [T]his court explicitly held that a restriction on heavy lifting was not alone sufficient to "demonstrate a significant restriction in the ability to perform either a class of jobs or a broad range of jobs in various classes." Indeed, we indicated that a heavy lifting restriction disqualified the plaintiff from at most a "narrow range of jobs."

273 F.3d 1094, 2001 WL 1085103, *2 (5th Cir. 2001) (quoting *Sherrod*, 132 F.3d at 1120).

Even if the Court were to disregard the numerous cases cited above in which the Fifth Circuit held that restrictions on heavy lifting do not substantially limit working—as the Court did at the summary judgment stage—Chollett nonetheless failed to produce more than a scintilla of evidence at trial that *his* 50-pound lifting restriction substantially limited *his* ability to work.

In its Memorandum Opinion and Order denying Patterson's motion for summary judgment on Chollett's ADA claims, the Court found that Chollett had "produced evidence to

show that he was significantly restricted because of his lifting impairment, in the ability to perform a class of jobs and a broad range of jobs in various classes, specifically working as a roughneck and other jobs involving manual labor." (Dkt. No. 28 at 16—17).[4] However, Chollett readily admitted at trial that there were "tons of jobs in [his] area that [he] could do with a 50-pound lifting restriction," including jobs that involved manual labor. (Pl. Trial Testimony at 244:12-14.) Specifically, Chollett identified a number of jobs he could have performed for Patterson, including driver, safety man, rig watchman, yardman, and electrician helper. (*Id.* at 242:6-23.) He also could have performed work on top drives and wire pits. (*Id.* at 242:14-18.) Chollett further testified that there were numerous jobs outside of Patterson that he was qualified to perform with a 50-pound lifting restriction, including lineman, hydraulic mechanic, electrician, plumber, driver, top-driver technician, carpenter, and iron worker. (*Id.* at 242:24—243:22.)

Based on the plethora of case law cited above, as well as the evidence submitted at trial—including Chollett's own identification of at least a dozen jobs that he was qualified to perform with his 50-pound lifting restriction—the Court finds that, as a matter of law, Chollett's temporary restriction on heavy lifting did not "substantially limit" his ability to work.

### b. Record of a substantially limiting impairment

In the alternative, Chollett contends that he "did establish [at trial] that he had a record of an impairment that substantially limited him in the activity of working." (Dkt. No. 102 at 20.) According to Chollett, his record of impairment "began with [his] shoulder injury in 2005 and extended through his termination in 2007." (*Id.*)

---

4. To the extent the Court previously found that "roughneck" or "drilling rig worker" constitute a "class of jobs," the Court has reconsidered that conclusion and finds that it was erroneous.

Although the ADA does not define "record of impairment," the regulations provide: "Has a record of such impairment means has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more of the major life activities." 29 C.F.R. § 1630.2(k). Thus, in order to make out a claim for discrimination based on a record of impairment, Chollett must show that at some point in the past, he was classified or misclassified as having an impairment that substantially limited a major life activity. *See Burch v. Coca-Cola Co.*, 119 F.3d 305, 321 (5th Cir. 1997).

There is no doubt that Chollett offered substantial evidence at trial that the shoulder injury he sustained in 2005 impaired his ability to perform heavy lifting from time to time. However, as explained in Part III.A.1.a, *supra*, Chollett's restriction on heavy lifting does not substantially limit a major life activity, including working. "[B]ecause [Chollett's] impairment is not a disability within the parameters of the ADA, his record of having such an impairment, likewise, cannot be actionable under the ADA." *Ingles v. Neiman Marcus Group*, 974 F. Supp. 996, 1004 (S.D. Tex. July 30, 1997).  *See also Hinojosa v. Jostens Inc*., 128 Fed. App'x 364, 367 n.2 (5th Cir. 2005) ("[R]estrictions indicating an inability to perform continuous, heavy lifting or an inability to perform a particular job do not necessarily constitute a record of disability."); *Pryor v. Trane Co.*, 138 F.3d 1024, 1027—28 (5th Cir. 1998) (rejecting plaintiff's contention that her injury, surgery, hospitalization, and inability to work for two years due to lifting impairment established a record of a disability for purposes of the ADA); *Ray*, 85 F.3d at 229 (even though plaintiff missed more than a year of work and underwent surgeries to replace his hips and shoulders, restrictions on heavy lifting did not establish a record of disability because the inability to perform heavy lifting did not render an employee substantially limited as to working).

### 3. Regarded as having a substantially limiting impairment

In the alternative, Chollett contends that "[e]ven if this Court concludes that [his] physical impairment (shoulder lifting limitation or shoulder injury) did not substantially limit the major life activity of working, Chollett still prevails (as having a disability) under the 'regarded as' prong of the definition of 'disability.'" (Dkt. No. 102 at 15 (parentheticals in original).)

To meet the definition of being "regarded as" having a disability under the ADA, Chollett must show that Patterson either: (1) mistakenly believed that Chollett had a physical impairment that substantially limited one or more major life activities, or (2) mistakenly believed that an actual, nonlimiting impairment substantially limited one or more major life activities. *See Sutton*, 527 U.S. at 489. However, both of these showings require that Chollett demonstrate that Patterson actually "entertain[ed] misperceptions" about Chollett. *Id*. "An employer does not necessarily regard an employee as having a substantially limiting impairment simply because it believes that she is incapable of performing a particular job[.]" *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 806 (5th Cir. 1997) (citing *Ellison v. Software Spectrum, Inc.,* 85 F.3d 187, 192 (5th Cir. 1996); 29 C.F.R. § 1630.2(j)(3)(I)). "[T]he statutory reference to a substantial limitation indicates instead that an employer regards an employee as substantially limited in his or her ability to work by finding the employee's impairment to foreclose generally the type of employment involved." *Id.*

The undisputed evidence presented at trial showed that the motorman job required Chollett to lift more than 100 pounds continuously throughout the day; however, per his own doctor's orders, Chollett was limited to lifting no more than 50 pounds. (Pl. Trial Testimony at 191:12-14.) The fact that Patterson believed Chollett was incapable of performing the motorman job based on his own doctor's imposition of restrictions on heavy lifting does not indicate that

Patterson regarded Chollett as disabled. *Bennett v. Calabrian Chemicals Corp.*, 324 F. Supp. 2d 815, 833 (E.D. Tex. 2004) ("[I]f the employer's belief corresponds to the employee's or his physician's description of his limitations, the employer cannot be viewed as improperly regarding him as disabled.") (citing *Byrne v. Board of Educ.,* 979 F.2d 560, 567 (7th Cir. 1992); *Bernard v. Doskocil Cos., Inc.*, 861 F. Supp. 1006, 1013 n.13 (D. Kan. 1994) ("Although [the employer] apparently did, based on the work restrictions prescribed by [the plaintiff's physician], regard plaintiff as having a condition which prevented him from performing certain functions, prong (3) is intended to encompass those situations in which an employer regards someone as disabled based on certain stereotypes or myths, not a situation where a person is regarded as having limitations because a doctor has said so.")).

Much like Chollett, the plaintiff in *Ray v. Glidden* claimed that his former employer regarded him as "having an impairment which substantially limited his ability to lift, reach and/or work." *Ray*, 85 F.3d at 229. The Fifth Circuit found that because the employer presented evidence that it terminated the plaintiff for not being able to perform his prior job, and the plaintiff presented no evidence that there were other positions available that he could perform, no reasonable juror could find that the employer perceived the plaintiff as disabled. *Id.* at 229—30; *see also Moody v. M.W. Kellogg Co*., 1999 WL 153032, *5 (5th Cir. 1999) ("At most, the testimony establishes that some employees believed [Plaintiff] had limitations on [his] ability to do heavy lifting. Because a limitation on heavy lifting is not a substantial limitation of a major life activity under the ADA, a perception that an employee has a heavy lifting limitation cannot amount to a perception that the employee is disabled.") (citing *Sherrod*, 132 F.3d at 1119—20; *Ray*, 85 F.3d at 229).

15

Chollett nonetheless contends that Patterson's refusal to reassign him to the rig watch job "was tantamount to regarding him as unable to do any job for Patterson because it was probably the easiest job available." (Dkt. No. 102 at 17—18.) Chollett further claims that "Patterson's refusing to consider Chollett for any job because of the lifting restriction was further support for the fact that they regarded him as unfit to perform a wide range of jobs, since Patterson's drilling business encompassed many classes and types of jobs." (*Id.* at 18.) As the Court explains fully in Part III.B, *infra*, Chollett failed to demonstrate that there were any vacant positions at Patterson in July 2007 that he was qualified to perform with his lifting restriction, including the rig watch job. "[J]ust because there are no jobs available that fit Plaintiff's restrictions does not mean Plaintiff is regarded as being excluded from an entire class of jobs (and thus as disabled)." *Pryor*, 138 F.3d at 1028.

Having considered the evidence presented at trial and the controlling law, the Court finds that, as a matter of law, Chollett's impairment does not satisfy any of the three alternatives for having the requisite "disability" under the ADA.

### 4. Otherwise qualified

Even if Chollett were disabled under the ADA, he was still required to demonstrate at trial that he was "otherwise qualified" for his job. *Heilweil*, 32 F.3d at 722; *Chiari v. City of League City*, 920 F.2d 311, 315 (5th Cir. 1991); *Leckelt v. Board of Commissioners*, 909 F.2d 820, 827 (5th Cir. 1990).

Determining whether an individual is otherwise qualified for their job involves a two-prong test. First, the jury must determine whether an individual can perform the essential functions of the job; second, if the individual is unable to perform the essential functions, the jury must determine whether any reasonable accommodation by the employer would enable the

employee to perform those functions. *Chandler v. City of Dallas*, 2 F.3d 1385, 1393—94 (5th Cir. 1993).

> The ADA defines reasonable accommodation as:
>
> (A)     making existing facilities used by employees readily accessible to and useable by individuals with disabilities; and
>
> (B)     job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training material or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9).

Chollett admitted at trial that he could not do the motorman's job at the time he was terminated in July 2007.

> Q: [S]o you couldn't have done your motorman's job on July 6, 2007 could you?
> A. Probably not . . .
> Q. But, I'm saying, could you have been a motorman from July 6th through July 19th, 2007?
> A. Nothing over 50 pounds, I couldn't.

(Pl. Trial Testimony at 190:23-25; 191:12-14). Instead, Chollett claimed that a reasonable accommodation existed that would have enabled him to perform the essential functions of his job.

In response to Question Nos. 3, 4, and 5 on the Verdict Form, the jury found that Chollett requested an accommodation in 2007, that a reasonable accommodation existed in 2007 that would have allowed Chollett to perform the essential functions of the job, and that Patterson failed to reasonably accommodate Chollett. (Dkt. No. 75 at 3—5.) However, the jury was not asked to identify what that reasonable accommodation was.

In its Memorandum Opinion and Order denying Patterson's Motion for Summary Judgment on Chollett's ADA claim, the Court found that Chollett had "presented evidence

showing that Patterson could have allowed Chollett the reasonable accommodation of watching Rig 528 in early July 2007 after Chollett received the fifty-pound lifting restriction." (Dkt. No. 28 at 18.) The Court further noted that Chollett "assert[ed] that Patterson could have granted him unpaid leave for the thirty days the light-duty restriction imposed by Dr. Solcher was expected to be in place." (*Id.* at 19.) Finally, Chollett testified at trial that he asked Titus Clifton about moving jobs from the rig to a yardman or safety man position, and that sometime in 2007 he wrote a letter to Patterson about an opening for a safety man position he saw posted in the tool pushers house. (Pl. Trial Testimony at 55:8-11; 57:20-24.)[5]

With respect to unpaid leave, Chollett admitted at trial that he never requested any time off work because he did not want it:

> Q: You didn't ask for any leave, right, you didn't want any time off?
> A: On the rig?
> Q: Yes.
> A: No.
> Q: . . . [A]ll the way through July of 2007, you never wanted to take a day off because of your injury, right?
> A: No, sir.

(*Id.* at 193:9-18.) Thus, Patterson was not required to provide the unrequested accommodation of 30 days unpaid leave. *See Morton v. GTE North, Inc.*, 922 F. Supp. 1169, 1180 (N.D. Tex. 1996) ("'[T]he employee cannot expect the employer to read [his] mind and know [he] secretly wanted a particular accommodation and sue the employer for not providing it.'") (quoting *Schmidt v. Safeway Inc.*, 864 F. Supp. 991, 997 (D. Oregon 1994)).

Chollett also failed to present evidence that any of the other positions he desired at Patterson were vacant. Although Chollett testified that he expressed interest in transferring to a yardman or safety man position, Chollett admitted that no such positions were open in July 2007:

---

5. It is unclear whether Chollett's requests regarding the yardman and safety man positions were made before or after he was placed on restricted duty in July 2007.

> Q: Now, there were no open yardman or safety man positions that you
> know of from August of 2006 all the way through July of 2007, were
> there?
> A: Not that I know of.
> Q: That's right. You heard Terry Allen testify yesterday that there hadn't
> been an open position, what was it, '06, '07, went into January 1st,
> '08?
> A: Yes, sir.
>                                         . . .
> A: I agree with Terry Allen. I can't argue with him.

(Pl. Trial Testimony at 177:22—178:9.)[6]

Finally, with respect to the rig watch position, in its Order denying Patterson's Motion for Summary Judgment on Chollett's ADA claims, the Court found that Chollett had "presented evidence showing that the [rig watch] position was available, as Walter Koricanek, the area superintendent for Patterson, told Chollett to do 'rig watch' on Rig 528 after Chollett's July 2007 restrictions, although that instruction was later revoked by Titus Clifton." (Dkt. No. 28 at 19 (citing Chollett Declaration ¶ 19).) However, the evidence presented at trial—including Chollett's own testimony—conclusively demonstrates that, like the yard man and safety man positions, the rig watch position on Rig 528 was also not vacant in July 2007.

Chollett testified that on or about July 12, 2007, he went out to the rig to relieve Parker, who was working the rig watch position at that time. (Chollett Tr. Testimony at 199:11-19.) When Chollett got to the rig, Parker told Chollett to call Titus, who then told Chollett he needed a full-duty release before he could come back to work. (*Id.* at 202:6-12.) This was because the rig watch position was only open through July 15, 2007, as it was already filled by Parker. (Def. Trial Ex. 63, 01009-14.) Although Chollett speculated that Patterson was "either going to send

---

6. As noted in Part III.A.1.a, *supra*, Chollett testified that there were a number of other positions at Patterson besides motorman that he could perform with a 50-pound lifting restriction, including driver, electrician helper, and working on top drives and wire pits. There is no evidence that Chollett requested to be transferred to any of these positions, and he admitted in response to Patterson's motion for JMOL that "there was no evidence that any of those jobs were reasonably available to him." (Dkt. No. 102 at 9.)

[Parker] to another rig or, you know, we'd send him back to relieve me here or whatever you want to call it" (Chollett Tr. Testimony at 200:2-5), Chollett admitted that it was not Parker's last day in the rig watch position, that when Chollett went out to Rig 528 he was "telling [Parker] that he was leaving," and that Parker continued working in that position after July 12, 2007. (*Id.* at 200:13-22.) Finally, Chollett explicitly stated that the rig watch spot was not vacant.

> Q: The spot wasn't vacant though, was it?
> A: No, sir.

(*Id.* at 200:8-9.)

"For the accommodation of a reassignment to be reasonable, it is clear that a position must first exist and be vacant. Under the ADA, an employer is not required to give what it does not have." *Foreman v. Babcock & Wilcox Co.* 117 F.3d 800, 810 (5th Cir. 1997). Moreover, "[a]n employer is not obligated under the ADA to always provide the employee with best possible accommodations or to accommodate the employee in the specific manner he requested." *Rayha v. United Parcel Service, Inc.*, 940 F. Supp. 1066, 1070 (S.D. Tex. 1996). Furthermore, as Justice Scalia explained in his dissenting opinion in *Barnett*,

> [T]he phrase "reassignment to a vacant position" . . . envisions elimination of the obstacle of the *current position* (which requires activity that the disabled employee cannot tolerate) when there is an alternate position freely available. If he is qualified for that position, and no one else is seeking it, or no one else who seeks it is better qualified, he *must* be given the position. But "reassignment to a vacant position" does *not* envision the elimination of obstacles to the employee's service in the new position that have nothing to do with his disability—for example, another employee's claim to that position under a seniority system, or another employee's superior qualifications.

*U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 415—16 (2002) (Scalia, J. dissenting) (internal citations omitted). *See also Daugherty v. City of El Paso*, 56 F.3d 695, 700 (5th Cir. 1995) (The ADA does not require "affirmative action in favor of individuals with disabilities, in the sense of requiring that disabled persons be given priority in hiring or reassignment over those who are not

20

disabled. It prohibits employment discrimination against qualified individuals with disabilities, no more and no less.").

Although Patterson could have bumped Parker to another position and allowed Chollett to fill the rig watch position on Rig 528 while he was on restricted duty, as a number of courts have recognized, an employer "is not required to 'bump' other employees to create a vacancy so as to reassign [Plaintiff]." *Cannizzaro v. Neiman Marcus, Inc.,* 979 F.Supp. 465, 475 (N.D. Tex. 1997) (citing *Weiler v. Household Fin. Corp.,* 101 F.3d 519, 526 (7th Cir. 1996)); *Lucas v. W.W. Grainger, Inc.,* 257 F.3d 1249, 1256 (11th Cir. 17, 2001) ("The reassignment duty, however, does not require the employer to bump another employee from a position in order to accommodate a disabled employee."); *see also EEOC Enforcement Guidance*, 405 Fair Empl. Prac. Man. (BNA) 7391, 7400 (Sept. 3, 1996) ("The ADA does not require an employer to create a new position or to bump another employee from his/her position.").

In sum, the Court finds that the evidence presented at trial "points but one way," *Hampton*, 247 F.3d at 1099, and that is toward the conclusion that there were no vacant positions at Patterson in July 2007 that Chollett was qualified to perform with his 50-pound lifting restriction. As such, no reasonable jury could have concluded that a reasonable accommodation existed in July 2007 that would have allowed Plaintiff to perform the essential functions of his job. Thus, even if Chollett were disabled under the ADA, "[w]ithout evidence to show that he either could have performed his previous job or could have filled a *vacant* opening, [Chollett] is not a qualified individual with a disability, so a reasonable jury could not conclude that [Patterson] discriminated in violation of the ADA." *Vitale v. Georgia Gulf Corp.*, 82 Fed. App'x 873, 876 (5th Cir. 2003).

**V. Conclusion**

Because a reasonable jury would not have a legally sufficient evidentiary basis to find that Chollett was a qualified individual with a disability, Patterson is entitled to JMOL on Chollett's ADA claim. *See* FED. R. CIV. P. 50(a)(1); *see also Phillips v. F.D. East*, 81 Fed. App'x 483, 485 (5th Cir. 2003). The Court is of the opinion that a new trial in this matter is not warranted.

For the reasons set forth above, it is hereby **ORDERED** as follows:

1. Defendant's Renewed Motion for Judgment as a Matter of Law (Dkt. No. 97) is **GRANTED**;

2. The jury's April 2, 2010 verdict in favor of Plaintiff (Dkt. No. 75) is **SET ASIDE**;

3. Final Judgment entered September 14, 2010 against Defendant and in favor of Plaintiff is **VACATED**;

4. Final Judgment against Plaintiff and in favor of Defendant shall be entered; and

5. Plaintiff's Motion for Attorney's fees (Dkt. No. 95) is **DENIED**.

**SIGNED** this 30th day of September, 2011.

JOHN D. RAINEY
SENIOR U.S. DISTRICT JUDGE